Nos. 24-6134 & 25-5111

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ENERGY AND POLICY INSTITUTE,

Plaintiff-Appellant,

v.

TENNESSEE VALLEY AUTHORITY,

Defendant-Appellee.

On Appeal from the United States District Court for the
Eastern District of Tennessee, Northern Division

**BRIEF OF DEFENDANT-APPELLEE
TENNESSEE VALLEY AUTHORITY**

May 16, 2025

David D. Ayliffe
Associate General Counsel
F. Regina Koho
Lane E. McCarty
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.2396
Email lemccarty@tva.gov

Attorneys for Defendant-Appellee
Tennessee Valley Authority

## CORPORATE DISCLOSURE STATEMENT

The Tennessee Valley Authority ("TVA") is an executive branch corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831 et seq. TVA is wholly owned by the United States; that ownership is evidenced by the TVA Act. TVA has no parent corporation and has no stock certificates.

i

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ I

TABLE OF CONTENTS ................................................................................... II

TABLE OF AUTHORITIES ............................................................................. V

STATEMENT REGARDING ORAL ARGUMENT ........................................ XIII

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 2

STATEMENT OF THE CASE ........................................................................... 3

INTRODUCTION ........................................................................................... 3

BACKGROUND AND STATUTORY FRAMEWORK ........................................ 7

    I.      General FOIA Principles ................................................................... 7

           A.     The McGuireWoods Request ..................................................... 10

           B.     The AEGIS Request .................................................................. 14

           C.     The District Court Proceedings .................................................. 16

STANDARD OF REVIEW ............................................................................. 20

SUMMARY OF THE ARGUMENT ................................................................ 21

ARGUMENT ................................................................................................ 23

    I.      The District Court Correctly Sustained TVA's Exemption 4 Withholdings as Confidential Information in Which McGuireWoods and AEGIS Have a Commercial Interest and Which Reveal Commercial Operations ................................................ 23

           A.     The McGuireWoods information was properly withheld under Exemption 4. ........................................................ 24

1.   The withheld McGuireWoods information is commercial. ...................................................24

2.   The withheld McGuireWoods information is confidential. ..................................................32

3.   The McGuireWoods information was obtained from a person. ...........................................................35

4.   TVA satisfied the foreseeable harm requirement. ..........37

B.   The AEGIS information was properly withheld under Exemption 4. ..........................................................41

1.   The withheld AEGIS information is commercial. .........41

2.   The withheld AEGIS information is confidential. .........43

3.   TVA satisfied the foreseeable harm requirement. ..........45

II.   Exemption 5 Provides an Independent Basis for Certain Withholdings. ..................................................48

A.   TVA's withholding of certain McGuireWoods information was proper under Exemption 5 and the attorney-client privilege. ..................................................48

1.   McGuireWoods' legal advice and guidance to clients is protected by the attorney-client privilege. ........49

2.   TVA satisfied the foreseeable harm requirement. ..........56

III.   The District Court Correctly Sustained TVA's FOIA Exemption 6 Withholdings. ..........................................57

A.   The non-agency individuals' substantial privacy interests are served by withholding their identity and contact information. ..................................................59

B.   There is no cognizable public interest in disclosure of non-agency individuals' names and contact information. ..............60

iii

IV.    TVA Satisfied Its Segregability Obligations. ....................................63

V.    The District Court Correctly Concluded that EPI is Not Eligible
to Recover an Award of Attorney's Fees Under FOIA. .....................66

    A.    The catalyst theory does not apply to documents released
due to McGuireWoods' withdrawal of its Exemption 4
objections to certain material. ...................................................67

    B.    EPI is not entitled to fees for the nine documents for which
TVA determined that Exemption 5 did not apply. ...................72

CONCLUSION....................................................................................................75

CERTIFICATE OF COMPLIANCE...................................................................76

CERTIFICATE OF SERVICE ............................................................................77

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ...............1

# TABLE OF AUTHORITIES

**Cases:** **Page**

*Abraham & Rose, P.L.C. v. United States*,
138 F.3d 1075 (6th Cir. 1998) ....................................................... 62

*Am. First Legal Found. v. United States Dep't of Agric.*,
126 F.4th 691 (D.C. Cir. 2025) ...................................................... 34

*ACLU v. Dep't of Def.*,
628 F.3d 612 (D.C. Cir. 2011) ................................................. 64, 72

*ACLU v. United States Dep't of Just.*,
655 F.3d 1 (D.C. Cir. 2011) ..................................................... 20, 60

*ACLU v. Dep't of Just.*,
750 F.3d 927 (D.C. Cir. 2014) ...................................................... 20

*Am. Com. Barge Lines Co. v. Nat'l Lab. Rel. Bd.*,
758 F.2d 1109 (6th Cir. 1985) ...................................................... 21

*Am. Mgmt. Servs. v. Dep't of the Army*,
703 F.3d 724 (4th Cir. 2013) .................................................. 26, 31

*Baker & Hostetler LLP v. United States Dep't of Commerce*,
473 F.3d 312 (D.C. Cir. 2006) ................................................ 24, 26

*Bartko v. United States Dep't of Just.*,
898 F.3d 51 (D.C. Cir. 2018) ......................................................... 9

*Bibles v. Or. Natural Desert Ass'n*,
519 U.S. 355 (1997) ...................................................................... 61

*Bloomberg L.P. v. United States Postal Serv.*,
118 F.4th 307 (2d Cir. 2024) ........................................................ 24

*Campaign for Responsible Transplantation v. FDA*,
511 F.3d 187 (D.C. Cir. 2007) ...................................................... 71

*Canadian Commercial Corp. v. Dep't of Air Force,*
514 F.3d 37 (D.C. Cir. 2008) ............................................................... 42

*CareToLive v. FDA,*
631 F.3d 336 (6th Cir. 2011) ............................................................... 36

*Carney v. United States Dep't of Just.,*
19 F.3d 807 (2d Cir. 1994) ................................................................... 9

*Ctr. for Nat'l Sec. Studies v. United States Dep't of Just.,*
331 F.3d 918 (D.C. Cir. 2003) ............................................................... 7

*Cent. Intel. Agency v. Sims,*
471 U.S. 159 (1985) ............................................................................... 7

*Cincinnati Enquirer v. Dep't of Just.,*
45 F.4th 929 (6th Cir. 2012) ............................................................... 20

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.,*
854 F.3d 675 (D.C. Cir. 2017) ............................................................. 61

*Citizens for Resp. & Ethics in Wash. v. United States Dep't of Just.,*
58 F.4th 1255 (D.C. Cir. 2023) ................................................ 24, 27, 34

*Davy v. Cent. Intel. Agency,*
550 F.3d 1155 (D.C. Cir. 2008) ........................................................... 71

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
532 U.S. 1 (2001) ................................................................................. 50

*Edelman v. SEC,*
356 F. Supp. 3d 97 (D.D.C. 2019) ....................................................... 73

*EEOC v. Ferrellgas, L.P.,*
97 F.4th 338 (6th Cir. 2024) ............................................................... 49

*FTC v. Grolier Inc.,*
462 U.S. 19 (1983) ............................................................................... 53

*Farmworker Just. v. United States. Dep't of Agric.,*
No. 19-cv-1946, 2021 WL 827162 (D.D.C. Mar. 4, 2021) .................... 34

vi

*Fenster v. Brown*,
617 F.2d 740 (D.C. Cir. 1979) ................................................................. 73

*First Amendment Coal. v. United States Dep't of Just.*,
878 F.3d 1119 (9th Cir. 2017) ................................................................. 66

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ................................................................. *passim*

*Grand Canyon Tr. v. Bernhardt*,
947 F.3d 94 (D.C. Cir. 2020) ........................................................ 21, 67, 70

*Greenberg v. FDA*,
803 F.2d 1213 (D.C. Cir. 1986) ................................................................. 28

*Griffin Indus. Inc. v. EPA*,
640 F.3d 683 (6th Cir. 2011) ................................................................. 10

*Gulf & Western Indus. v. United States*,
615 F.2d 527 (D.C. Cir. 1979) ................................................................. 35

*Herrick v. Garvey*,
298 F.3d 1184 (10th Cir. 2002) ................................................................. 68

*Hull v. IRS*,
656 F.3d 1174 (10th Cir. 2011) ................................................................. 9

*In re Grand Jury Investigation*,
723 F.2d 447 (6th Cir.1983) ................................................................. 49

*In re Grand Jury Subpoena* (*United States v. Doe*),
886 F.2d 135 (6th Cir.1989) ................................................................. 49

*In re Lindsey*,
148 F.3d 1100 (D.C. Cir. 1998) ................................................................. 57

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ................................................................. 65

*Insider Inc. v. Gen. Servs. Admin.*,
92 F.4th 1131 (D.C. Cir. 2024) ................................................................. 62

vii

*Jimenez v. Dep't of Homeland Sec.*,
   119 F.4th 892 (11th Cir. 2024) ............................................................ 36

*Jones v. FBI*,
   41 F.3d 238 (6th Cir. 1994) ............................................................ 9, 20

*Judicial Watch, Inc. v. FBI*,
   522 F.3d 364 (D.C. Cir. 2008) ............................................................ 66

*Kwoka v. IRS*,
   989 F.3d 1058 (D.C. Cir. 2021) ............................................................ 21

*Lionbridge Tech. v. Valley Forge Ins.*,
   53 F.4th 711 (1st Cir. 2022) ............................................................ 51

*Long v. Off. of Personnel Mgmt.*,
   692 F.3d 185 (2nd Cir. 2012) ............................................................ 62

*Lucaj v. FBI*,
   852 F.3d 541 (6th Cir. 2017) ............................................................ 49, 50

*Machado Amadis v. United States Dep't of State*,
   971 F.3d 364 (D.C. Cir. 2020) ............................................................ 39

*Madel v. United States Dep't of Just.*
   784 F.3d 448 (8th Cir. 2015) ............................................................ 28, 38

*Maynard v. Cent. Intel. Agency*,
   986 F.2d 547 (1st Cir. 1993) ............................................................ 9

*McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin*,
   180 F.3d 303 (D.C. Cir. 1999) ............................................................ 27, 45

*McDonnell Douglas Corp. v. United States Dep't of the Air Force*,
   375 F.3d 1182 (D.C. Cir. 2004) ............................................................ 46

*McKinley v. Fed. Hous. Fin. Agency*,
   739 F.3d 707 (D.C. Cir. 2014) ............................................................ 73

*Mead Data Ctr., Inc. v. Dep't of the Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ............................................................ 58, 65

*Miccosukee Tribe of Indians of Fla. v. United States*,
    516 F.3d 1235 (11th Cir. 2008) ............................................................... 8

*Mil. Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ............................................................... 64

*Morley v. Cent. Intel. Agency*,
    894 F.3d 389 (D.C. Cir. 2018) ....................................................... 20, 74

*Multi Ag Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (D.C. Cir. 2008) .............................................................. 60

*Nat'l Lab. Rel. Bd. v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ....................................................................... 8, 49

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) ......................................................................... 61

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002) ......................................................... 59, 61

*Nat'l Ass'n of Ret. Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) ....................................................... 60, 61

*Nat'l Parks & Conservation Ass'n v. Kleppe*,
    547 F.2d 673 (D.C. Cir. 1976) ............................................................. 38

*New Hampshire Right to Life v. United States Dep't of Health & Human Servs.*,
    778 F.3d 43 (1st Cir. 2015) ..................................................... 24, 27, 29

*People for the Ethical Treatment of Animals v. United States Health & Human Servs.*,
    901 F.3d 343 (D.C. Cir. 2018) ..................................................... 25, 41

*Perioperative Servs. & Logistics, LLC v. VA*,
    57 F.4th 1061 (D.C. Cir. 2023) ............................................... 58, 60, 65

*Pomares v. Dep't of Veterans Aff.*,
    113 F.4th 870 (9th Cir. 2024) ......................................... 25, 26, 60, 68

*Porup v. Cent. Intel. Agency*,
   997 F.3d 1224 (D.C. Cir. 2021) ................................................................. 63

*Public Citizen Health Rsch. Grp. v. FDA*,
   704 F.2d 1280 (D.C. Cir. 1983) ................................................24, 25, 26, 28

*Public Citizen Health Rsch. Grp. v. FDA*,
   185 F.3d 898 (D.C. Cir. 1999) ........................................................... 26, 38

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
   421 U.S. 168 (1975) ............................................................................ 53

*Rimmer v. Holder*,
   700 F.3d 246 (6th Cir. 2012) ................................................................. 20

*Rocky Mountain Wild, Inc. v. United States Forest Serv.*,
   No. 18-CV-03065-MEH, 2021 WL 825985 (D. Colo. Mar. 4, 2021) ............ 27

*Rocky Mountain Wild, Inc. v. United States Forest Serv.*,
   56 F.4th 913 (10th Cir. 2022) ........................................................... 27, 57

*Rojas v. FAA*,
   989 F.3d 666 (9th Cir. 2021) ................................................................. 50

*Rugiero v. United States Dep't of Just.*,
   257 F.3d 534 (6th Cir. 2001) ........................................................... 58, 59

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ............................................................... 9

*Seife v. FDA*,
   43 F.4th 231 (2d Cir. 2022) ....................................................... 37, 39, 41

*Simon v. Dep't of Just.*,
   980 F.2d 782 (D.C. Cir. 1992) ............................................................... 48

*S. Env't L. Ctr. v. TVA*,
   659 F.Supp.3d 902 (E.D. Tenn. 2023) ...................................................... 47

*Sussman v. United States Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ....................................................... 64, 65

x

*Tax Analysts v. IRS,*
   117 F.3d 607 (D.C. Cir. 1997)......................................................... 50

*United States Dep't of State v. Wash. Post Co.,*
   456 U.S. 595 (1982)....................................................................... 58

*United States Dep't of Just. v. Reporters Comm. for Freedom of Press,*
   489 U.S. 749 (1989)....................................................................... 61

*United States v. Weber Aircraft Corp.,*
   465 U.S. 792 (1984)....................................................................... 53

*United Techs. Corp., Pratt & Whitney Div. v. United States Dep't of Def.,*
   601 F.3d 557 (D.C. Cir. 2010) ................................................. 25, 43

*Upjohn v. United States,*
   449 U.S. 383 (1981)..........................................................49, 50, 51, 57

*Vidal-Martinez v. United States Dep't of Homeland Sec.,*
   84 F.4th 743 (7th Cir. 2023)........................................................... 70

*Water Transp. Ass'n v. I.C.C.,*
   722 F.2d 1025 (2d Cir. 1983)......................................................... 46

*Watkins v. United States Bureau of Customs & Border Prot.,*
   643 F.3d 1189 (9th Cir. 2011) ....................................................... 25

*Webb v. HHS,*
   696 F.2d 101 (D.C. Cir. 1982) .................................................. 29, 46

*Weisberg v. United States Dep't of Just.,*
   848 F.2d 1265 (D.C. Cir. 1988) ................................................ 67, 72

**Statutes, Regulations, and Other Authorities:**

5 U.S.C. § 551 ................................................................................. 35

5 U.S.C. § 552 ..........................................................................3, 7, 21

5 U.S.C. § 552(a)(4) ....................................................................... 68

5 U.S.C. § 552(a)(4)(B) ...................................................................... 1

5 U.S.C. § 552(a)(4)(E) ............................................................... 20, 67

5 U.S.C. § 552(a)(4)(E)(i) ..................................................................... 20

5 U.S.C. § 552(a)(8)(A)(i)(I) ........................................................... 8, 41

5 U.S.C. § 552(b)(1)–(9) ...................................................................... 7

5 U.S.C. § 552(b)(4) ...................................................... 3, 8, 23, 24

5 U.S.C. § 552(b)(5) ............................................................. 3, 8, 49

5 U.S.C. § 552(b)(6) ............................................................. 3, 8, 58

16 U.S.C. §§ 831–831ee .................................................................... 7

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

18 C.F.R. §§ 1301.1–.02 ................................................................... 21

18 C.F.R. § 1301.8 ...................................................................... 12, 23

18 C.F.R. § 1301.8(a)–(f) .................................................................... 9

18 C.F.R. § 1301.8(b)(2) ..................................................................... 9

18 C.F.R. § 1301.8(f) ......................................................................... 68

18 C.F.R. § 1301.8(g) .................................................................. 10, 69

Black's Law Dictionary (8th ed. 2004) ........................................... 67

H.R. Rep. No. 1497, 89th Cong., 2d Sess.10 ................................... 28

## STATEMENT REGARDING ORAL ARGUMENT

TVA does not request oral argument. The facts and legal arguments are adequately presented in the briefs and the record, and the relevant law is clear and straightforward; however, should the Court determine that oral argument would aid the Court in its decisional process, counsel for TVA would be glad to appear.

## STATEMENT OF JURISDICTION

Plaintiff Energy and Policy Institute ("EPI") asserted jurisdiction in the district court pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1331. On October 21, 2024, the district court entered final judgment granting TVA's Motion for Summary Judgment (J. Order, RE 49, Page ID # 966), from which EPI appealed on December 19, 2024 (Notice of Appeal, RE 60, Page ID # 1090). On February 5, 2025, the district court entered a Memorandum Opinion and Order denying EPI's Motion for Attorney's Fees and Costs. (Mem. Op. & Ord., RE 66, Page ID # 1136.) EPI appealed that order on February 5, 2025. (Notice of Appeal, RE 67, Page ID # 1137.) This Court consolidated the two appeals on February 14, 2025. (Order, 6 Cir. R. 19.) This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court correctly concluded that TVA satisfied its burden of demonstrating the applicability of FOIA Exemption 4 because the withheld information is confidential commercial information of third parties and because it is reasonably foreseeable that disclosure would result in competitive harm to the third parties.

2.     Whether, in the alternative, TVA's withholdings of certain information from a law firm who provided legal representation to TVA was also proper under FOIA Exemption 5 and the attorney-client privilege because it consisted of confidential communications between attorneys and clients related to legal advice and guidance and because it is reasonably foreseeable that disclosure would chill TVA's access to information and legal advice.

3.     Whether the district court correctly concluded that TVA satisfied its burden of demonstrating the applicability of FOIA Exemption 6 where the privacy interest in the identity and contact information of private, non-government individuals outweighs the public interest in disclosure and the information does not advance any understanding of TVA's operations nor shed any light on the agency's performance of its duties and because it is reasonably foreseeable that disclosure would open these individuals up to unsolicited contact.

4.      Whether the district court correctly concluded that EPI was ineligible for attorney's fees under FOIA because the third party—not TVA—changed its position with regard to information originally withheld pursuant to FOIA Exemption 4.

## STATEMENT OF THE CASE

### INTRODUCTION

American businesses submit vast amounts of information to the government for a wide range of reasons: regulatory compliance, contracting and procurement, education, and legal representation, among others. While the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, creates a general rule that information held by federal agencies is subject to disclosure, Congress exempted privileged or confidential commercial information submitted to the government by private parties. That exemption, 5 U.S.C. § 552(b)(4) ("FOIA Exemption 4"), has long been construed broadly by the courts who recognize that FOIA's open-government mandate does not require exposing information that businesses keep confidential from their competitors simply because the information has been submitted to a federal agency. Nor does FOIA generally require the disclosure of information normally protected in civil discovery, such as information subject to the attorney-client privilege. *See* 5 U.S.C. § 552(b)(5) ("FOIA Exemption 5"). Also exempt from disclosure under 5 U.S.C. § 552(b)(6) ("FOIA Exemption 6") is personal identifiable

3

information of private, non-agency individuals in government records which, if disclosed, would be a clearly unwarranted invasion of personal privacy.

This case involves two businesses, law firm McGuireWoods LLC ("McGuireWoods") and insurance company Associated Electric & Gas Insurance Services ("AEGIS"), both of whom submitted information to TVA in the course of doing business with the government. This information was the subject of two separate FOIA requests by EPI to TVA. FOIA Request 21-FOI-00109 ("McGuireWoods request") sought communications between TVA and McGuireWoods attorneys who represent TVA (and others) as part of two client groups, the Climate Legal Group ("CLG") and the Power Generators Air Coalition ("PGen"), as well as McGuireWoods' representation of TVA in an individual matter involving Clean Air Act issues. FOIA Request 21-FOI-00208 ("AEGIS request") sought TVA's excess liability insurance policy, a policy underwritten by AEGIS ("TVA-AEGIS Policy"). Both businesses objected to certain information being disclosed pursuant to FOIA Exemption 4, which exempts from disclosure confidential commercial or financial information of persons outside the government.

In response to the McGuireWoods request, TVA withheld certain portions of the responsive documents under FOIA Exemptions 4, 5, and 6. In response to the AEGIS request, TVA withheld certain portions of the TVA-AEGIS Policy under FOIA Exemptions 4 and 5. EPI appealed the TVA FOIA Officer's initial

4

determinations and TVA's FOIA Appeal Officer affirmed the initial determination. EPI disagreed with TVA's determinations and filed suit.

The district court affirmed TVA's withholdings under FOIA Exemption 4 as to both FOIA requests. It found that the withheld information was commercial or financial information of McGuireWoods and AEGIS because the information revealed the third parties' basic commercial operations and was information in which they had a commercial interest. Specifically, the withheld information was the primary vehicle through which the submitters generate profits and compete in their respective fields, and each business actually and customarily treated the withheld information as private. The district court also affirmed TVA's withholdings under FOIA Exemption 6 and found that the disclosure of private, non-agency individuals' identity and contact information implicated a significant privacy interest and that disclosure would not advance any understanding of TVA's operations nor shed any light on the agency's performance of its duties. Finally, the district court found that FOIA Exemption 4 provided an independent and sufficient basis to justify withholding the information so it was unnecessary to consider the application of FOIA Exemption 5 to either request.

The undisputed record shows that TVA fulfilled its obligations under FOIA and that the district court's judgment for TVA on all EPI's claims was correct and should be affirmed. EPI's challenges to TVA's withholdings fail to counter the

explanations for the exemptions in the declarations, as well as the comprehensive *Vaughn* Index for information withheld in response to the McGuireWoods request.[1] These filings detail the specific types of information withheld and logically demonstrate how the information falls within the scope of the cited exemptions. The filings also demonstrate the requisite foreseeable harm likely to result from disclosure of the withheld material. EPI's challenge to the district court's opinion misstates and misapplies the case law, ignores the contents of the declarations, and relies on the same speculative arguments that failed to sway the district court.

Finally, because TVA—not EPI—was the prevailing party on all claims the district court correctly denied EPI's motion for attorney's fees and costs under FOIA. The district court found that based on FOIA's clear language, EPI did not show eligibility for fees under the catalyst theory because McGuireWoods, not TVA, changed its position with regard to information withheld pursuant to FOIA Exemption 4. This conclusion is fully supported by the facts and the applicable law.

---

[1]    TVA's initial *Vaughn* Index and supplemental *Vaughn* Index (RE 45-1) pertain only to the McGuireWoods request. The applicable exemptions for information withheld in response to this request are explained in declarations by TVA employees Buddy Eller (RE 33), Maria Gillen (RE 35), and two declarations by Makram Jaber of McGuireWoods (Jaber. Decl., RE 34; Supp. Jaber Decl., RE 46). As to the AEGIS request, the redacted TVA-AEGIS Policy is part of the record (RE 36-1), and the basis for the withholdings and the applicable exemptions are explained in declarations by TVA employees Mr. Eller (RE 33), Kirk A. Kelley (RE 37), and in a declaration by Martin Gaffney of AEGIS (RE 36).

For these reasons, the district court's judgment for TVA on EPI's FOIA claims and the district court's order denying EPI's motion for attorney's fees and costs should both be affirmed.

## BACKGROUND AND STATUTORY FRAMEWORK

### I.        General FOIA Principles

TVA is a constitutionally authorized executive branch corporate agency and instrumentality of the United States created by the TVA Act of 1933. 16 U.S.C. §§ 831–831ee. FOIA applies to TVA because it is a federal agency, which allows the public to access certain records from federal agencies. 5 U.S.C. § 552. "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. United States Dep't of Just.*, 331 F.3d 918, 925 (D.C. Cir. 2003). While FOIA requires disclosure under certain circumstances, "Congress recognized [ ] that public disclosure is not always in the public interest[.]" *Cent. Intel. Agency v. Sims*, 471 U.S. 159, 166–67 (1985).

Agency records that fall within one of the nine enumerated exemptions, 5 U.S.C. § 552(b)(1)–(9), are exempt and therefore need not be disclosed. "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's

disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) [hereinafter "*Argus Leader*"] (cleaned up).

This appeal involves FOIA Exemptions 4, 5, and 6. Exemption 4 prevents disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency," 5 U.S.C. § 552(b)(5), including information within the scope of attorney-client privilege. *See Nat'l Lab. Rel. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 148–49 (1975) [hereinafter "*Sears Roebuck*"]. Exemption 6 protects personal privacy, permitting an agency to withhold "personnel and medical files and similar files the disclosure of which would clearly constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Pursuant to the FOIA Improvement Act ("FIA"), an agency may withhold information pursuant to a FOIA exemption "only if . . . the agency reasonably foresees that disclosure would harm an interest protected by" that exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I).

While the agency bears the burden of demonstrating that it properly withheld information under an exemption, an agency may rely on affidavits or declarations to meet its burden "so long as they provide an adequate factual basis for the district court to render a decision." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1258–59 (11th Cir. 2008) (an adequate factual basis can be provided by

8

affidavits, a *Vaughn* index, in camera review, or a combination of these methods). Thus, as long as agency affidavits reasonably specify how the documents fall within the exemption, the agency satisfies its burden under FOIA. *Hull v. IRS*, 656 F.3d 1174, 1177–78 (10th Cir. 2011) (agency affidavits demonstrated with reasonable specificity why the information falls within the stated exemption). Declarations of an agency are also entitled to a presumption of good faith unless shown otherwise. *See Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994); *Carney v. United States Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994); *Maynard v. Cent. Intel. Agency*, 986 F.2d 547, 560 (1st Cir. 1993); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Mere speculation is not enough to rebut that presumption. *See Bartko v. United States Dep't of Just.*, 898 F.3d 51, 74 (D.C. Cir. 2018); *SafeCard Servs.*, 926 F.2d at 1201.

When a FOIA request seeks information submitted to TVA by a third party and is timely designated as information protected from disclosure under FOIA Exemption 4, TVA's FOIA regulations require it to provide written notice to the submitter[2] of the information and an opportunity to object to the disclosure of any specified portion of the information. 18 C.F.R. § 1301.8(a)–(f). TVA is required to "consider a submitter's objections and specific grounds for nondisclosure in

---

[2]   A submitter for purposes of TVA's FOIA regulations means "any person or entity from whom TVA obtains business information, directly or indirectly." 18 C.F.R. § 1301.8(b)(2).

deciding whether to disclose business information[.]" *Id.* § 1301.8(g). If TVA decides to disclose business information over a submitter's objection, TVA must give the submitter written notice. *Id.* If the submitter disagrees with TVA's determination, the submitter may file a "reverse FOIA" action under the Administrative Procedures Act for judicial review of the agency's decision to release information to the public. *See, e.g.*, *Griffin Indus. Inc. v. EPA*, 640 F.3d 683, 684 (6th Cir. 2011) (submitter granted injunctive relief in reverse FOIA action against agency).

## A.     The McGuireWoods Request

EPI sought communications between TVA and McGuireWoods attorneys, who represent TVA (and others) as part of two client groups, the CLG and PGen, and separately represented TVA in a matter involving Clean Air Act issues. (McGuireWoods Request, RE 21-1, Page ID ## 147–48.)

The CLG is a client group whose members include TVA, companies, and industry and business organizations. (Supp. Jaber Decl., RE 46, Page ID # 874.) The CLG retained McGuireWoods to provide the group with information and advice on, and analysis of, legal developments in the climate change arena, including Environmental Social & Governance issues, climate change litigation, and state and federal regulations involving climate change. (*Id.*) CLG members pay dues to the CLG for the purpose of retaining and paying legal counsel to provide the members

with legal services and counsel that meets the needs of their organizations, as well as to recruit and attract new members. (*Id.*) The CLG is a part of a competitive field of specialized legal services that entities can choose from and which operate in a complicated regulatory field. (*Id.*)

PGen is a nonprofit 501(c)(6) organization whose members consist of electric utilities and cooperatives, including TVA, and these entities are listed on PGen's public website. (*Id.*, Page ID ## 874–75.) The founding members of PGen retained McGuireWoods to provide legal advice to the founders and to assist them in forming PGen as a non-profit corporation. (*Id.*) Once PGen was formed, it retained McGuireWoods to provide members with information, advice, analysis, and counsel concerning legal developments regarding Clean Air Act regulations relevant to their facilities and operations. (*Id.*) PGen members also used McGuireWoods to advise them concerning how PGen is presented to the public and to potential members. (*Id.*) PGen's board of directors also directs McGuireWoods to assist in preparing comments on major Clean Air Act rules relevant to PGen and its members. (*Id.*) PGen's objectives are to retain its members by providing them with legal services and counsel that meet the needs of their organizations, as well as to recruit and attract new members. (*Id.*) PGen is also a part of a competitive field of specialized legal services that entities can chose from and which operate in a complicated regulatory field. (*Id.*)

11

TVA's FOIA Officer identified 369 documents responsive to the McGuireWoods request, all of which were email communications and related attachments from McGuireWoods attorneys to their clients and responses from clients, including TVA. (Eller Decl., RE 33, Page ID # 416.) The documents relate to McGuireWoods' representation of TVA, CLG, and PGen and contain information related to McGuireWoods' legal services and their legal work product. (Supp. Jaber Decl. RE 46, Page ID ## 873–76; *see also* Supp. Chart, RE 46-1, Page ID ## 916–20.) As required by TVA's FOIA regulations, 18 C.F.R. § 1301.8, TVA's FOIA Officer notified McGuireWoods of the request and provided it with the responsive documents. (Eller Decl., RE 33, Page ID # 417.) McGuireWoods objected to the disclosure of certain information in those documents under FOIA Exemption 4. (*Id.*, Page ID ## 417–18; Jaber Decl., RE 34, Page ID ## 495–96; McGuireWoods Obj., RE 34-2, Page ID ## 517–18.)

In light of McGuireWoods' objection and TVA's assessment of the objection, TVA's FOIA Officer withheld the information objected to under Exemption 4. (Eller Decl., RE 33, Page ID ## 417–18.) The withheld and redacted documents contain information relating to McGuireWoods' representation of the CLG and PGen, as well as McGuireWoods' individual representation of TVA on Clean Air Act issues.

As to the CLG, TVA withheld the rates of McGuireWoods' attorneys and the identity of CLG members and prospective members (McGuireWoods' clients and

12

prospective clients). (Jaber Decl., RE 34, Page ID # 507; Supp. Jaber Decl., RE 46, Page ID ## 881, 904–05.) TVA also withheld attorney-client communications reflecting McGuireWoods' strategies and the services it provides to the CLG, such as attorney analysis, advice, commentary, and guidance on climate-related regulatory and litigation developments tailored to the common interests of the CLG members as well as advice to the CLG on the group's administration (e.g., by-laws, membership, and dues). (Supp. Jaber Decl., RE 46, Page ID ## 879–84.)

For PGen, TVA withheld the identity of prospective members (and, thus, prospective McGuireWoods' clients) and McGuireWoods' marketing strategy to prospective clients. (*Id.*, Page ID ## 886, 888, 901–03.) TVA also withheld attorney-client communications reflecting McGuireWoods' strategies related to the services it provides to PGen, including communications and legal advice regarding PGen's formation, incorporation, and operation (e.g., strategies, governance, and voting) and PGen's operations (e.g., budget and dues). (*Id.*, Page ID ## 887–96, 899.) TVA also withheld attorney-client communications relating to draft documents (formation and operation documents, talking points for the group) and McGuireWoods' attorney-client communications relating to the legal services it provides PGen, namely, legal counsel's analysis of regulations and legal advice to members in preparing comments on rules. (*Id.*, Page ID ## 887–902.)

As to McGuireWoods' individual representation of TVA on Clean Air Act issues, TVA withheld corporate bank account information and attorney rates for particular legal services offered to TVA. (*Id.*, Page ID ## 904–06.) It also withheld information relating to the scope of legal services offered to TVA, McGuireWoods' strategies for providing those legal services, and attorney-client communications regarding TVA's areas of interest and need, as well as legal advice, analysis, and guidance. (*Id.*, Page ID ## 907–13.)

TVA's FOIA Officer also determined that certain documents contained communications between McGuireWoods attorneys and clients made for the purpose of conveying legal advice and therefore were exempt under Exemption 5 pursuant to the attorney-client privilege. (Eller Decl., RE 33, Page ID ## 416–17.)

Finally, TVA's FOIA Officer determined that certain documents contained information that was exempt under Exemption 6. Specifically, she determined that the names of private, non-agency individuals, such as employees of members of the CLG and employees of members and prospective members of PGen, and their direct telephone numbers and email addresses, should be withheld. (*Id.*)[3]

## B.    The AEGIS Request

TVA's FOIA Officer identified Excess Liability Insurance Policy No. XL5045111P ("TVA-AEGIS Policy") underwritten by AEGIS as responsive to

---

[3]    TVA did not withhold any document solely based on Exemption 6.

EPI's request for TVA's "in-effect" liability (operations) policy. (AEGIS Request, RE 21-6, Page ID ## 159–63; Eller Decl., RE 33, Page ID # 427.) AEGIS is a mutual insurance company whose product is its insurance policies. (Gaffney Decl., RE 36, Page ID ## 539–40.) The TVA-AEGIS Policy contains proprietary pricing and coverage terms and conditions specifically tailored to TVA that reveal AEGIS' proprietary underwriting process, as well as its corporate business strategy. (*Id.*, Page ID # 541.) This includes information relating to AEGIS' decisions for expanding or contracting the types of coverage AEGIS offered to TVA and AEGIS' approach to managing risks specific to TVA. (*Id.*)

As required by TVA's FOIA regulations, TVA's FOIA Officer notified AEGIS of the request, and AEGIS objected to the disclosure of certain portions of the TVA-AEGIS Policy as "confidential commercial and financial information [of AEGIS], or otherwise considered competitively sensitive." (Eller Decl., RE 33, Page ID # 428; AEGIS Obj. RE 36-2, Page ID ## 598–99.)

Due to AEGIS' objection and TVA's assessment of that objection, TVA's FOIA Officer withheld the objected-to information in the policy under Exemption 4. (Eller Decl., RE 33, Page ID # 428.) TVA provided EPI with a copy of the TVA-AEGIS Policy with the exempt information redacted. (*Id.*, Page ID ## 428–29.)

## C.    The District Court Proceedings

Prior to any motions practice in the case, TVA released 166 documents because McGuireWoods withdrew its Exemption 4 objections to certain information in those documents. (Eller Decl., RE 33, Page ID # 424; Jan. 13, 2023 Ltr., RE 33-1, Page ID # 436.)[4] TVA did not assert (and did not have) any separate objections to disclosure based on any other FOIA exemption. (Eller Decl., RE 33, Page ID # 424.) TVA simultaneously provided EPI with a draft *Vaughn* index. (*Id*.) McGuireWoods subsequently withdrew its Exemption 4 objection to ten additional documents, and TVA released them. (Eller Decl., RE 33, Page ID ## 425–26; Apr. 4, 2023 Ltr., RE 33-2, Page ID # 438; Jun. 9, 2023 Ltr., RE 59-3, Page ID # 1087.) TVA also provided EPI a revised draft *Vaughn* index to reflect new disclosures and/or redactions made to documents for which information was reasonably segregable. (Eller Decl., RE 33, Page ID # 425.)

After summary judgment briefing was complete, TVA became aware that a contract for legal services had been provided to EPI as part of TVA's response to a separate FOIA request by EPI. (Nov. 28, 2023 Ltr., RE 59-4, Page ID # 1088.) TVA had initially withheld drafts of this contract and related correspondence as attorney-

---

[4]    Mr. Eller's declaration states that this number was 181. This number included the documents TVA's FOIA Officer initially produced to EPI. This means that 166 new documents were disclosed on January 13, 2023, for which McGuireWoods had withdrawn its objections and for which TVA did not assert (and did not have) any separate objections.

client privileged information in response to the McGuireWoods request. (*Id.*) Because this legal services contract had previously been provided to EPI, TVA released, in part,[5] six emails relating to the finalization of the contract as well as three draft contracts. (*Id.*)

During the course of the litigation, neither AEGIS nor TVA changed or withdrew any assertion that Exemptions 4 and 5 applied to information redacted from the TVA-AEGIS Policy.

The district court granted summary judgment to TVA. (Mem. Op., RE 48.) The district court held that TVA had properly withheld the McGuireWoods information under Exemption 4. (Mem. Op., RE 48, Page ID # 950.) It reasoned that TVA "clearly established that each of the disputed categories of documents are 'commercial'" (*id.*, Page ID # 940), that each document at issue originated from a "person" (*id.*, Page ID # 944), and that McGuireWoods' information was "customarily and actually treated as private by its owner," (*id.*, Page ID ## 946–47). The district court reasoned that disclosure of this information would reveal

---

[5]     The disclosed documents contain redactions pursuant to Exemptions 4, 5, and 6. The Exemption 4 redactions are for McGuireWoods' rates and information about the firm's legal services. The Exemption 5 redaction is for attorney-client privileged communications concerning the legal interpretation of certain contractual terms in the draft contract. The Exemption 6 redaction is for personal contact information of an individual. (Supp. *Vaughn* Index. RE 45-1, Page ID ## 843–44 (Nos. 109 through 118).) The final copy of the legal services contract produced in response to the separate FOIA request by EPI also contains a redaction pursuant to Exemption 4 (McGuireWoods' rates).

McGuireWoods' "bank account and commercial transaction information," as well as its "business practice and strategy." (*Id.*, Page ID ## 941–42). The court concluded that TVA had shown that disclosure of the McGuireWoods information would cause competitive harm to the firm by giving its competitors access to confidential commercial information. (*Id.*, Page ID ## 949–50.)

The district court also upheld TVA's application of Exemption 6 to the names and contact information of private, non-agency individuals. (*Id.*, Page ID ## 954–55.) It reasoned that "the privacy interest at stake in personal contact information is self-evident" and "would subject individuals to unsolicited contact." (*Id.*, Page ID # 954.) The court held that this privacy interest outweighed any public interest in disclosure, reasoning that "plaintiff fails to demonstrate how its general mission of 'researching TVA's role in special interest groups' is furthered by the disclosure of non-agency members' contact information" and that "personal contact information 'does not shed light on the agency's performance of its duties.'" (*Id.*, Page ID # 955.)

The district court also found that TVA satisfied its burden of showing that Exemption 4 applied to the AEGIS information. (*Id.*, Page ID # 964.) The court found that TVA had demonstrated that the redacted information was "commercial" and, like the McGuireWoods information, "the primary vehicle through which [AEGIS] earn[s] profit[s] and compete[s] in the marketplace[.]" (*Id.*, Page ID ## 961–62.) Likewise, the district court determined that AEGIS customarily and

18

actually treated the withheld information in the TVA-AEGIS Policy as private and confidential. (*Id.*, Page ID ## 962–63.) Finally, the district court concluded that TVA had shown that "disclosure of the insurance policy beyond the present redactions risks reasonably foreseeable harm" because it would harm "AEGIS' competitive standing in its highly specialized field of insurance underwriting." (*Id.*, Page ID # 964 (internal quotation marks and citation omitted).)

The district court found it unnecessary to rule on whether TVA properly invoked Exemption 5 and the attorney-client privilege as to either the McGuireWoods or the AEGIS information because Exemption 5 was claimed concurrently with Exemption 4. (*Id.*, Page ID ## 955–56.)

Following the district court's grant of summary judgment in TVA's favor, EPI filed a motion for attorney's fees and costs claiming it "substantially prevailed." (Mot. Attorney's Fees, RE 52, Page ID # 970.) The district court denied EPI's motion. It rejected EPI's argument that its lawsuit served as a catalyst for the release of information by TVA because TVA "released most of these documents in response to new representations by McGuireWoods regarding its sought exemptions—and before any motion practice[.]" (Mem. Op. & Ord., RE 66, Page ID ## 1135–36.) The district court found that the change in position by McGuireWoods—not TVA— meant that EPI had "neither demonstrated that it prompted a 'voluntary disclosure or change in position *by the Government*,' nor that 'the action had a substantive

19

causative effect on the delivery of the information.'" (*Id.* (citations omitted).)

Accordingly, the district court found that EPI did not "'substantially prevail[]'"

within the meaning of 5 U.S.C. § 552(a)(4)(E)(i) and that it was ineligible for a

discretionary award of attorney fees and other litigation costs. (*Id.*, Page ID # 1134.)

## STANDARD OF REVIEW

This Court reviews "de novo a district court's grant of summary judgment in

a FOIA proceeding." *Cincinnati Enquirer v. Dep't of Just.*, 45 F.4th 929, 932 (6th

Cir. 2012). In a FOIA case, "generally, [the] burden is on the agency to sustain its

action." *Id*. De novo review, "[i]n the FOIA context[,] . . . requires that [the court]

ascertain whether the agency has sustained its burden of demonstrating that the

documents requested are . . . exempt from disclosure under FOIA." *ACLU v. Dep't*

*of Just.*, 750 F.3d 927, 931 (D.C. Cir. 2014) (quoting *ACLU v. United States Dep't*

*of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011)). "Ordinarily, an agency will offer detailed

affidavits, rather than the requested documents themselves, to justify its decision to

withhold information, and these affidavits are entitled to a presumption of good faith

absent evidence to the contrary." *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir.

2012) (citing *Jones*, 41 F.3d at 242–43)).

The Court reviews for abuse of discretion a district court's denial of attorney's

fees under FOIA generally. *See, e.g.*, *Morley v. Cent. Intel. Agency*, 894 F.3d 389,

391 (D.C. Cir. 2018) (citing 5 U.S.C. § 552(a)(4)(E)); *Am. Com. Barge Lines Co. v.*

20

*Nat'l Lab. Rel. Bd.*, 758 F.2d 1109, 1111 (6th Cir. 1985); *Kwoka v. IRS*, 989 F.3d 1058, 1064 (D.C. Cir. 2021) (reviewing award of fees for abuse of discretion). The Court reviews the district court's decision about FOIA fee eligibility de novo to the extent it is based on "an interpretation of the statutory terms that define eligibility for an award," and for clear error to the extent it is based on a finding of fact. *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 95–97 (D.C. Cir. 2020) [hereinafter "*Bernhardt*"] (citation omitted).

## SUMMARY OF THE ARGUMENT

Summary judgment for TVA was proper in this action because TVA fully complied with FOIA, 5 U.S.C. § 552, and TVA's FOIA regulations, 18 C.F.R. §§ 1301.1–.02. Nothing in this case warrants second guessing of the district court.

As demonstrated by detailed agency and submitter declarations and a comprehensive *Vaughn* Index, TVA appropriately withheld confidential commercial or financial information of McGuireWoods and AEGIS under FOIA Exemption 4 because these third parties have a commercial interest in the information they submitted to TVA. The district court correctly concluded that the withheld McGuireWoods information is commercial because it relates to McGuireWoods' commercial operations and strategies of providing legal services and work product to clients and prospective clients and is information McGuireWoods treats privately. The district court likewise correctly concluded that the AEGIS information is

21

commercial because it reflects the straightforward income producing aspects of AEGIS' insurance business and is treated privately.

The district court also correctly found that disclosure of the withheld McGuireWoods and AEGIS information would foreseeably harm important interests protected by Exemption 4, namely, public disclosure would reveal valuable commercial information to competitors of McGuireWoods and AEGIS, thereby foreseeably causing competitive harm to the submitters in their respective fields of business.

The district court also correctly concluded that TVA appropriately withheld the identity and contact information of private, non-agency individuals. As the district court held, the significant privacy interests of these individuals outweighs the public interest in disclosure, and the information would not advance any understanding of TVA's operations nor shed any light on the agency's performance of its duties. The district court also correctly found that it was reasonably foreseeable that disclosure would open these private individuals up to unsolicited contact.

While not necessary for the district court's decision, TVA's withholdings under FOIA Exemption 5 and the attorney-client privilege with regard to the McGuireWoods information were also proper because the information was communicated in confidence between attorneys and their clients and relates to legal advice and guidance by attorneys. TVA has also shown that disclosure of the

withheld information would foreseeably harm the ability of TVA personnel to have frank and open communications with TVA's attorneys, thus harming TVA's ability to engage in fully informed decision making.

Finally, the district court correctly concluded that EPI is not eligible for attorney's fees because McGuireWoods, not TVA, changed its position with regard to information withheld pursuant to Exemption 4.

## ARGUMENT

**I.    The District Court Correctly Sustained TVA's Exemption 4 Withholdings as Confidential Information in Which McGuireWoods and AEGIS Have a Commercial Interest and Which Reveal Commercial Operations.**

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4); *see also* 18 C.F.R. § 1301.8 (TVA regulations implementing Exemption 4). The district court correctly sustained TVA's withholding of information that McGuireWoods and AEGIS designated as confidential commercial or financial information under Exemption 4 because it is confidential information in which the submitter has a commercial interest. (Mem. Op., RE 48, Page ID ## 950, 964.)

**A.   The McGuireWoods information was properly withheld under Exemption 4.**

**1.   The withheld McGuireWoods information is commercial.**

The threshold requirement for the application of Exemption 4 is that the information constitute "commercial or financial information." 5 U.S.C. § 552(b)(4). The terms "commercial" and "financial" are given their ordinary meanings. *See Argus Leader*, 588 U.S. at 436–37 (analyzing text of Exemption 4 by a "careful examination of the ordinary meaning and structure of the law itself").

Information is "commercial" if it "has a commercial nature or serves a commercial function." *Citizens for Resp. & Ethics in Wash. v. United States Dep't of Just.*, 58 F.4th 1255, 1262–68 (D.C. Cir. 2023); *see also Bloomberg L.P. v. United States Postal Serv.*, 118 F.4th 307, 317 n.2 (2d Cir. 2024) (information is commercial if it is "pertaining or relating to or dealing with commerce"); *New Hampshire Right to Life v. United States Dep't of Health & Human Servs.*, 778 F.3d 43, 49–50 (1st Cir. 2015) (same). In considering whether information is commercial, courts have examined whether the submitter has a "commercial interest" in the information. *Public Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) [hereinafter "*Public Citizen*"]; *see Baker & Hostetler LLP v. United States Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) [hereinafter "*Baker*"] (finding that letters describing "favorable market conditions for domestic [lumber] companies" constituted "commercial information" because those companies "have a

24

'commercial interest' in such letters" and release would help rivals "exploit those companies' competitive weaknesses"); *see also Watkins v. United States Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1194 (9th Cir. 2011) (finding information commercial which pertained to aspects of the submitters' businesses such as supply chains and fluctuations in demand). Thus, "commercial" includes information that is "designed to be profitable." *Pomares v. Dep't of Veterans Aff.*, 113 F.4th 870, 882 (9th Cir. 2024).

Records that "reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business" obviously satisfy the Exemption 4 standard. *Public Citizen*, 704 F.2d at 1290. This is true even if the value of the information is apparent only to those within the industry. *See, e.g.*, *People for the Ethical Treatment of Animals v. United States Health & Human Servs.*, 901 F.3d 343, 353 (D.C. Cir. 2018) (size of crates used to transport primates protected under Exemption 4 because it would provide insight into the type and number of primates imported); *United Techs. Corp., Pratt & Whitney Div. v. United States Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir. 2010) (finding that Exemption 4 applies to information that "identif[ies] and locate[s] particular parts and equipment and describe[s] the timing and criteria of internal inspections" because it would "reveal details about [contractor's] proprietary manufacturing and quality control processes").

25

Exemption 4 also extends to other types of information in which the submitter has a "commercial interest." *Baker*, 473 F.3d at 319. It "is *not* confined only to records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.'" *Id.* (quoting *Public Citizen*, 704 F.2d at 1290). For example, the research that manufacturers conduct when developing drugs is commercial information within the scope of Exemption 4. *Public Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 905 (D.C. Cir. 1999). Protection can also extend to "consulting agreements," *Pomares*, 113 F.4th at 882, and to "evidence of the deliberative processes used by counsel for [the submitter] to cull down the relevant documents and present them in a manner to achieve [the submitter's] objective[,]" *Am. Mgmt. Servs. v. Dep't of the Army*, 703 F.3d 724, 730–31 (4th Cir. 2013).

The district court determined that the withheld information falls within the ambit of Exemption 4 because it reveals McGuireWoods' commercial operations of providing legal services to clients and reflects its legal strategies, work product, and services. (Mem. Op., RE 48 Page ID # 940–43.) Specifically, the district court found that this information "actually reveal[s the] basic commercial operations [of McGuireWoods] and qualif[ies] as commercial" information. (*Id.* at 943 (citations omitted).)

The district court's determination was correct. The withheld information includes McGuireWoods' rates, its business strategy for determining the legal fees

26

it charges for its services, and corporate bank account information. (Jaber Decl., RE 34, Page ID ## 496, 503, 512; Supp. Jaber Decl., RE 46, Page ID ## 884, 904–07.) This information reveals McGuireWoods' "basic commercial operations" and is directly "relate[d] to the income-producing aspects" of its business (Mem. Op., RE 48 Page ID # 940). *See, e.g.*, *New Hampshire Right to Life*, 778 F.3d at 50 (documents which "outline the amounts [the submitter] charges customers for its services . . . surely pertain or relate to commerce as that term is ordinarily understood"); *McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin*, 180 F.3d 303, 304 (D.C. Cir. 1999) (submission of proposed prices for certain contract line items); *Rocky Mountain Wild, Inc. v. United States Forest Serv.*, No. 18-CV-03065-MEH, 2021 WL 825985, at *19 (D. Colo. Mar. 4, 2021), *aff'd*, 56 F.4th 913 (10th Cir. 2022) (corporate bank account numbers are commercial).

The district court also correctly affirmed TVA's withholding of the identities of McGuireWoods' clients and prospective clients, such as CLG members and prospective members of the CLG and PGen. (Mem. Op, RE 48, Page ID ## 942–43; Jaber Decl., RE 34, Page ID # 507; Supp. Jaber Decl., RE 46, Page ID ## 881, 886, 888, 901–05.) Customer lists are "intrinsically valuable business information" of the type that FOIA was designed to protect. *Citizens for Resp. & Ethics in Wash.*, 58 F.4th at 1263. And Mr. Jaber's declaration establishes that the identity of McGuireWoods' clients is commercially valuable to the firm "given the highly

27

competitive legal arena in which these groups operate." (Supp. Jaber Decl., RE 46, Page ID # 881.) This information is therefore commercial. *See Public Citizen*, 704 F.2d at 1286 ("Congress clearly indicated that Exemption 4 as a whole could cover such materials as '. . . customer lists.'" (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess.10)); *Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (holding that customer lists constitute commercial information).

The district court's approval of TVA's withholding of information which provides a roadmap to the services McGuireWoods offers to its clients and markets to its potential clients was also correct. (Mem. Op., RE 48, Page ID # 943; *see., e.g.*, Jaber Decl., RE 34, Page ID # 511; Supp. Jaber Decl., RE 46, Page ID ## 889, 904.) Information that competitors could use "to target specific markets," "forecast potential business," or to "gain market share" qualifies as commercial information. *Madel v. United States Dep't of Just.* 784 F.3d 448, 452–53 (8th Cir. 2015). The information here pertains to McGuireWoods' advice about the formation of the CLG and PGen, the incorporation of PGen, the objectives and strategies of both groups, and McGuireWoods' advice and guidance to the groups on dues and budget structure. (Supp. Jaber Decl., RE 46, Page ID ## 887–96, 899–902.) This information is commercial because it reflects both McGuireWoods' legal work product regarding the creation of specialized entities, such as the CLG and PGen, and its business strategy with regard to the creation and operation of such groups.

28

(*Id.*, Page ID ## 887–88.) Similarly, McGuireWoods' legal advice; guidance and commentary; and information relating to the legal services McGuireWoods provides to the CLG, PGen, and TVA reveal critical insights into McGuireWoods' business of providing legal services and what is essentially a roadmap for how to provide those services. (*See, e.g.*, Jaber Decl., RE 34, Page ID ## 503, 505–06, 507–08.) *See, e.g.*, *New Hampshire Right to Life*, 778 F.3d at 50 (documents that "outline [submitter's] operations" are commercial). If competitors were to obtain this information, it is reasonably foreseeable they would use it to gain an advantage over McGuireWoods in the competitive legal market "without incurring the time, labor, risk, and expense involved in developing" their own strategies for creating and serving this type of entity. *Webb v. HHS*, 696 F.2d 101, 103 (D.C. Cir. 1982).

EPI cherry-picks select documents and information in the record in an attempt to argue that the withheld information is not commercial in nature, but their arguments fail. For example, EPI claims that a single email sent to the CLG members about potential new members does not contain commercial information because "a third party's request for advice from TVA on how to best run a corporation policy group" is not commercial information. (EPI Br. at Page 37.) The email in question, No. 028 on the *Vaughn* Index (RE 45-1, Page ID # 832), was withheld in full because it contains exempt information under both Exemptions 4 and 6. (*Id.*) As to Exemption 4, TVA explained that the withheld information "consists of the

29

identification of a potential new member of the CLG and involves an attorney for the CLG seeking input from the CLG members about this potential new member joining the CLG." (*Id.*) Thus, the commercial information in this document is the identity of the CLG members *and* the potential new CLG member, and therefore current and prospective clients of McGuireWoods. (*Id.*) Like any client list, it is commercial information, *see supra* pages 27-28, and would be valuable to competitors of McGuireWoods. (Jaber Decl., RE 34, Page ID ## 505–06.)

EPI also challenges the commercial function of the CLG Update emails and emails concerning CLG operations. (EPI Br. at Page 37.) TVA withheld this information under both Exemption 4 and under Exemption 5 as attorney-client privileged. (*See, e.g.*, *Vaughn* Index, RE 45-1, Page ID # 829 (Nos. 001 & 006).) EPI argues that these emails are summaries of legal developments, are of no commercial value, and are no different than legal information McGuireWoods posts online. EPI is wrong. The CLG Updates contain discussions of climate-related regulatory and litigation developments in which CLG members have a common interest, along with McGuireWoods' attorney's legal advice, analysis, and guidance based on confidential communications with CLG members. (Supp. Jaber Decl., RE 46, Page ID ## 878–80.) The CLG Update emails are a "core part" of the CLG and the legal services McGuireWoods provides its clients as members of the CLG. (Jaber Decl., RE 34, Page ID # 505.) The content of these emails is commercial because it

30

is McGuireWoods' legal work product—which it sells—and reveals counsel's process of "cull[ing] down the relevant documents and present[ing] them in a manner to achieve [the submitter's] objective." *Am. Mgmt. Servs.*, 703 F.3d at 730–31.

Disclosure of those emails would provide McGuireWoods' competitors with its strategies for advising and operating the CLG, which competitors could use to McGuireWoods' disadvantage by creating similar groups without having to perform the work McGuireWoods did to conceptualize the services. (Jaber Decl., RE 34, Page ID ## 505–06.) Disclosure could also provide valuable information to competitors trying to solicit McGuireWoods' clients. (*Id.*) EPI's challenge to the commercial interest underlying the CLG Updates should therefore be rejected.

EPI also argues that an email described in the *Vaughn* Index as "regarding the formation and operation of PGen" does not contain commercial information. (EPI Br. at Page 38.) This ignores the context and descriptions provided in the Jaber Declarations for McGuireWoods' work related to PGen's formation and incorporation. (*See* Supp. Jaber Decl., RE 46, Page ID ## 884, 887–96.) This includes providing advice to PGen members concerning the group's goals, objectives, and priorities. (*Id.*, Page ID ## 886–94.) This advice is the product McGuireWoods sells to PGen; is how McGuireWoods generates revenue and income; and is competitively valuable because competitors could use it to create

31

their own competing groups in this specialized area of legal services. (*Id.*, Page ID ## 887–92.) Again, this sort of information falls comfortably within the ambit of "commercial" material.

In sum, none of EPI's piecemeal selection of information calls into question the district court's determination that TVA satisfied its burden of showing that the withheld McGuireWoods information is commercial.

### 2. The withheld McGuireWoods information is confidential.

"[C]ommercial or financial" information is considered "confidential" under Exemption 4 "whenever it is customarily kept private, or at least closely held, by the person imparting it," particularly when "the party receiving it provides some assurance that it will remain secret." *Argus Leader*, 588 U.S. at 434.

The district court correctly found that the withheld information is confidential because McGuireWoods explained that it was customarily and actually kept private by the firm and by its clients. (Mem. Op., RE 48 Page ID ## 946–47.) The information is also confidential because the client receiving it provided assurance that the information would remain private. (Jaber Decl. RE 34, Page ID ## 498–502; Gillen Decl., RE 35, Page ID ## 530–35.)

As a law firm, McGuireWoods has an ethical duty to maintain the confidentiality of information exchanged with clients and prospective clients. (Jaber Decl. RE 34, Page ID ## 494, 496–98, 500.) Thus, McGuireWoods typically keeps

32

information it exchanges with its clients private and closely held. (*Id.*, Page ID # 497.) McGuireWoods also advises clients not to disseminate or share confidential information; utilizes password protected document sharing systems/websites; and designates documents that contain confidential and privileged information as such, whether in the subject line, a heading, or a watermark on a draft document. (*Id.*, Page ID ## 498, 509–10.) If clients or prospective clients do not have an expectation that McGuireWoods will keep their communications confidential, there is likely to be an adverse effect on the firm's current clients' decisions to retain McGuireWoods as counsel and a chilling effect on prospective clients who may be considering McGuireWoods as their legal counsel. (*Id.*, Page ID ## 497–98.)

Members of the CLG and PGen also provided assurances to McGuireWoods that the information exchanged would be kept confidential within their respective joint client groups. The withheld information was designated as confidential in confidentiality agreements within the CLG's and PGen's governing documents and McGuireWoods, along with the members of the CLG and PGen (including TVA), are bound by those agreements. (*Id.*, Page ID ## 498–502.) Members of the CLG and PGen considered themselves bound by the confidentiality provisions; expected other members of the groups to treat the information as confidential; did not disclose confidential information to third parties; and maintained its confidentiality. (Gillen Decl., RE 35, Page ID ## 530–33.) McGuireWoods and TVA made a similar

33

promise of confidentiality in the legal services contract for the representation involving Clean Air Act issues. (*Id.*, Page ID ## 533–35.)

EPI suggests that TVA's declarations, together with the confidentiality provisions in CLG's and PGen's governing documents, are somehow not enough. (EPI Br. at Pages 41–42.) But it is well established that an agency "may 'carry [its] burden by submitting declarations attesting to the basis for the agency's decision.'" *Am. First Legal Found. v. United States Dep't of Agric.*, 126 F.4th 691, 694 (D.C. Cir. 2025) (quoting *Citizens for Resp. & Ethics in Wash.*, 58 F.4th at 1262). Summary judgment based on such affidavits is warranted absent "contrary evidence in the record." *Id.* EPI has submitted no evidence to the contrary.

EPI underscores its error in relying on an unpublished district court case, *Farmworker Justice v. United States Department of Agriculture*, No. 19-cv-1946, 2021 WL 827162 (D.D.C. Mar. 4, 2021), for the proposition that information shared with members of an organization cannot be considered confidential. That case involved evidence that the information was shared with a group whose members numbered "approximately 265,000 families" and therefore was not confidential. *Id.*, 2021 WL 827162 at *2. It bears little resemblance to the small client groups at issue

34

here[6] whose members are bound by confidentiality provisions in their governing documents. (Jaber Decl., RE 34, Page ID # 498–502.)

The withheld information was treated privately by the submitter (Jaber Decl., RE 34, Page ID ## 496–502), and there were assurances from the recipients of the information that it would be kept private. (Gillen Decl., RE 35, Page ID ## 530–33.) This satisfies Exemption 4's requirement, and therefore the district court correctly concluded that the commercial information was kept "confidential."

### 3.    The McGuireWoods information was obtained from a person.

The district court correctly determined that the withheld information was obtained from McGuireWoods—a person within the meaning of FOIA.[7] (Mem. Op., RE 48, Page ID # 944.)

EPI argues that this was in error because certain documents "may include" unidentified "contributions" by TVA employees and that there "may be" responses from TVA employees within email chains that were not disclosed. (EPI Br. at Pages 34, 39–41.) EPI's argument amounts to pure speculation as to what the documents

---

[6]    PGen currently has 16 members. *See* https://pgen.org/ (last visited May 15, 2025).

[7]    "Person" is defined by statute as "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). Information is "obtained from a person" for purposes of Exemption 4 if such information was supplied to the agency by a person outside the government. *Gulf & Western Indus. v. United States*, 615 F.2d 527, 529 (D.C. Cir. 1979).

35

might contain, and "[m]ere speculation" is insufficient "to rebut the presumption" of good faith afforded an agency's declaration. *Jimenez v. Dep't of Homeland Sec.*, 119 F.4th 892, 900 (11th Cir. 2024); *see also CareToLive v. FDA*, 631 F.3d 336, 345 (6th Cir. 2011) (to refute the presumption of good faith, "the requestor must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some other evidence why summary judgment is inappropriate") (cleaned up). EPI ignores Mr. Jaber's description of the withheld information as legal organizational and transactional work product and other documents, such as talking points and communications, all *drafted* by McGuireWoods as counsel for the CLG and/or PGen. (Supp. Jaber Decl., RE 46, Page ID # 890.)[8] In short, there is simply no evidence that any withheld information was authored or substantially reformulated by TVA.

---

[8]    EPI tries to use the text of one email, listed in the *Vaughn* Index at No. 365 (RE 45-1, Page ID # 871), as evidence purporting to show that TVA made substantial contributions to withheld information. It does not. In the email at No. 365, Mr. Jaber asks TVA employee Carolyn Koroa to "go through the [slide] presentation" forwarded by Mr. Jaber and "do" a particular subset of slides. (RE 31-1, Page ID # 398.) The slide deck referred to in the email is attached to Mr. Jaber's email and, as indicated on the *Vaughn* Index, is a duplicate of the slide deck listed at No. 032 on the *Vaughn* Index, which was emailed to the PGen membership at No. 030 and described in more detail in those entries. (RE 45-1, Page ID # 832 (Nos. 030 & 032).) Specifically, the *Vaughn* Index shows that the slide deck was emailed to the PGen membership as a "Final" slide deck and contains confidential commercial information of McGuireWoods pertaining to the "structure, governance, budget, and dues of PGen[.]" (*Id.*) Putting all of this together, there is nothing to indicate Mr. Jaber was doing more than asking Ms. Koroa to review a final slide deck.

36

### 4.    TVA satisfied the foreseeable harm requirement.

The district court properly determined that the disclosure of the withheld McGuireWoods information would harm an interest protected by Exemption 4, namely, that disclosure of the withheld information would foreseeably harm McGuireWoods' competitive business interests by revealing McGuireWoods' commercial information, such as its rates, clients, services, and business and marketing strategy, to competitors. (Mem. Op., RE 48, Page ID ## 949–50.)

"An agency in a FOIA case can . . . meet the foreseeable harm requirement of the FIA by showing foreseeable commercial or financial harm to the submitter upon release of the contested information." *Seife v. FDA*, 43 F.4th 231, 241–42 (2d Cir. 2022). Mr. Jaber and Mr. Eller's declarations establish that public disclosure of McGuireWoods' information would reveal McGuireWoods' rates, bank account information, lists of clients and perspective clients, and its business and marketing strategies for providing its unique types of legal services to clients and prospective clients. (Jaber Decl., RE 34, Page ID ## 497, 498, 503, 507, 510, 512; Supp. Jaber Decl. 46, Page ID ## 874–75, 878, 881, 908; Eller Decl., RE 33, Page ID ## 421–22.) This information would have substantial commercial value to McGuire Woods' competitors because these are emerging practices in the specialized legal services industry, particularly in the complicated area of environmental regulations. (Jaber Decl., RE 34, Page ID ## 503, 507–08, 510–11.) It would also allow competitors

37

access to McGuireWoods' client base and rates, potentially enabling competitors to lure away the firm's clients. (*Id.*, Page ID # 512.) Similarly, disclosure of potential PGen members would allow competitors access to McGuireWoods' potential client base and could harm McGuireWoods' ability to recruit future clients. (*Id.*, Page ID ## 510–11; Supp. Jaber Decl., RE 46, Page ID ## 882, 886, 888.)

Disclosing McGuireWoods' strategies for the operation of these groups and the services the firm provides would give competitors a detailed roadmap on how they could offer similar legal services that would compete with those offered by McGuireWoods. (Jaber Decl., RE 34, Page ID # 503; Supp. Jaber Decl., RE 46, Page ID ## 875, 878, 881.) This would allow competitors to profit from the work done by McGuireWoods in developing its legal strategies for operating these groups without having to do the work themselves. This is exactly the type of harm Exemption 4 was intended to prevent. *See, e.g.*, *Madel*, 784 F.3d at 452–53 (protecting information because "'[i]f competitors were to obtain such data, they would be able to use it to target specific markets, forecast potential business of new locations, or to gain market share in existing locations'"); *Public Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 905 (D.C. Cir. 1999) (quoting *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976)) ("Disclosure would provide competitors with valuable insights into the operational strengths and weaknesses of

38

a [company], while [its competitors] could continue in the customary manner of 'playing their cards close to their chest.'").

Disclosure of McGuireWoods' confidential commercial information in the competitive legal marketplace would also undermine McGuireWoods' competitive position by destroying McGuireWoods' promise of confidentiality in its communication with its clients. This would impair the firm's ability to keep current clients and would significantly deter prospective clients from retaining McGuireWoods. (Jaber Decl., RE 34, Page ID ## 497–98; Eller Decl., RE 33, Page ID ## 421–22.)

EPI claims that TVA's statements of foreseeable harm are boilerplate and insufficiently connect disclosure to reasonably foreseeable harms. (EPI Br. at Pages 44–45.) Not true. Mr. Jaber's declarations set out each category of information protected by Exemption 4 and articulate how disclosure would harm the competitive interests of McGuireWoods. (*See, e.g.,* Jaber Decl., RE 34, Page ID ## 503, 507–08, 510–11; Supp. Jaber Decl., RE 46, Page ID ## 882, 886, 888.) An agency may rely on declarations to show the exemption-protected harm. *See Seife*, 43 F.4th at 238, 242; *Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020). EPI's claim that TVA failed to satisfy the foreseeable harm is simply

39

unsupported and was properly rejected by the district court.[9]

EPI also claims, without any evidentiary support, that the information in the CLG Updates is "stale" and "widely available" and therefore would pose little competitive harm to McGuireWoods. (EPI Br. at Pages 46–47.) EPI has missed the point. The harm is in the disclosure of McGuireWoods' methods, strategy, and approach for providing legal services to clients and client groups. (*See, e.g.*, Supp. Jaber Decl., RE 46, Page ID ## 884, 888, 898, 902, 905.) Accepting EPI's argument presumes that all law firms operate and conduct the business of providing legal advice to their clients in the same manner, and how one firm provides advice is not competitively valuable. EPI's position is belied not only by common sense, but by Mr. Jaber's explanation of the substantial commercial value this information would have to competitors of McGuireWoods. (*See id.*; *see also* Jaber Decl., RE 34, Page ID ## 503, 506–07, 509–10, 512.) EPI's argument ignores the harm flowing to

---

[9]     The amicus brief filed by Appalachian Voices, Sierra Club, and Southern Environmental Law Center ("Amici Brief") challenges the district court's finding that TVA met the foreseeable harm requirement. (Brief, 6 Cir. R. 31.) That brief, however, relies solely on the *Vaughn* Index and completely ignores the Jaber Declarations which contain thorough and detailed explanations regarding the foreseeable harm to exemption protected interests. (*Id.* at Pages 22–29.) Amici's arguments are therefore unpersuasive because they are not reflective of either the record in this case or the district court's conclusion based on the complete record. The Amici Brief also contains irrelevant arguments. There are no allegations in this case related to missed deadlines, motions to dismiss, or failure to conduct reasonable searches. (*Id.* at Pages 10, 18–22.) The Court should disregard these arguments in the Amici Brief because they are not related to any of the issues on appeal in this case.

McGuireWoods from "[n]ew companies … be[ing] able to enter the market without the startup costs associated with researching successful" business development strategies and developing client lists. *People for the Ethical Treatment of Animals*, 901 F.3d at 353–54 (holding that information regarding primate importation was protected under Exemption 4). Competitive injury to the submitter, which is what the district court found that TVA established, is the type of harm to a protected interest that FOIA Exemption 4 was designed to protect. *Seife*, 43 F.4th at 238–39 (discussing 5 U.S.C. § 552(a)(8)(A)(i)(I)).

### B. The AEGIS information was properly withheld under Exemption 4.

### 1. The withheld AEGIS information is commercial.

The AEGIS information withheld under FOIA Exemption 4 is contained in an insurance policy between AEGIS and TVA. (TVA-AEGIS Policy, RE 36-1, Page ID ## 549–97.) The policy contains pricing and proprietary coverage terms specific to TVA. (Gaffney Decl., RE 36, Page ID ## 541–43.) This includes the policy period; the retroactive date and policy execution date; the policy premium; limitations of liability by type and amount; a list of, and explanations for, the underlying policy limits; and the types and extent of coverage offered by AEGIS and selected by TVA, including the pricing charged for the specific combination of coverage protections in the policy. (*Id.*, Page ID ## 543–44.) Also withheld are specific conditions, such as cross liability, non-duplication of limits, notice of claim

41

provisions, and portions of the condition pertaining to the discovery period. (*Id.*) Endorsements and schedules specific to TVA and the coverage offered and accepted were also withheld. (*Id.*, Page ID ## 544–45.) These terms reflect AEGIS' proprietary underwriting process and its corporate business strategy. (*Id.* at Page ID ## 541–44.)

The district court correctly concluded that TVA satisfied its burden of showing that the redacted information is commercial and reflects the "straightforward 'income-producing aspects of [AEGIS'] business.'" (Mem. Op., RE 48, Page ID # 961.) AEGIS customizes its individualized insurance policies based on AEGIS' proprietary assessment of the insured's individual risks and circumstances. (Gaffney Decl., RE 36, Page ID ## 541–43.) Matters relating to a business's pricing decisions—here, AEGIS' underwriting decisions for a particular insured as well as determinations about pricing structures and coverage limits—are inherently commercial because they are a core part of business strategy. *See, e.g., Canadian Com. Corp. v. Dep't of Air Force*, 514 F.3d 37, 39–40 (D.C. Cir. 2008) (line-item pricing in government contracts falls within Exemption 4).

EPI's only argument on appeal is that TVA did not describe how dates of coverage and a list of TVA facilities in the Policy are in and of themselves commercial. (EPI Br. at Pages 63–64.) This argument ignores the record evidence describing the commercial nature of this information and other redactions in the

42

Policy. (Gaffney Decl., RE 36, Page ID ## 541–45.) Mr. Gaffney testified that terms in the TVA-AEGIS Policy, such as those which reveal the in-effect dates for the policy, are directly related to AEGIS' proprietary pricing determinations. (*Id.*, Page ID ## 543–44.) Also proprietary to AEGIS are the retroactive and the policy execution dates because "the date on which a policy is issued and scheduled to expire and/or renew, reveals the limited window of opportunity for another insurer to make a competing offer." (*Id.*) Mr. Gaffney also described how the conditions of coverage in the Policy, such as the policy premium, limitations of liability by type and amount, underlying limits, and types and extent of coverage, reflect AEGIS' assessment of risk and cost of providing coverage to TVA. (*Id.*, Page ID ## 541–43.) This information falls squarely within the definition of commercial. *See, e.g., United Techs. Corp., Pratt & Whitney Div.*, 601 F.3d at 564 (information which reveals "details about [the contractor's] proprietary manufacturing and quality control processes" is commercial). Accordingly, EPI's challenge to the district court's finding that the information redacted from the TVA-AEGIS Policy is commercial should be rejected.

### 2.   The withheld AEGIS information is confidential.

The district court also correctly concluded that the information redacted from the TVA-AEGIS Policy is confidential because the record evidence shows it is actually and customarily treated as private by AEGIS. (Mem. Op., RE 48, Page ID

## 962–63.) AEGIS' practice is to treat the withheld information as private and confidential. (Gaffney Decl., RE 36, Page ID ## 542–43.) The course of dealing between TVA and AEGIS also demonstrates that it was the parties' usual practice and mutual understanding that the individualized terms and conditions of AEGIS' insurance policies would be kept confidential. (Kelley Decl., RE 37, Page ID # 604.) The parties also required the use of nondisclosure agreements in the course of exchanging confidential information. (*Id.*, Page ID ## 602–04.) Nothing more is required. *See Argus Leader*, 588 U.S. at 434 (information is confidential "whenever it is customarily kept private, or at least closely held, by the person imparting it").

EPI misses the point in asserting that AEGIS policies for other utilities are available online and that AEGIS publishes general information about its insurance offerings. (EPI Br. at Pages 64–65.) Publicly available policies of other utilities does not impinge on the confidential nature of the TVA-AEGIS Policy and the parties' treatment of AEGIS' proprietary assessment of TVA's individual risks and circumstances as confidential. (Gaffney Decl., RE 36, Page ID ## 541–42.) That confidential and protected information is TVA- specific. (*Id.*, Page ID ## 542–43.) It reflects AEGIS' assessment of TVA's risk and the coverage terms and premiums proposed to TVA. (*Id.*) And AEGIS treats this information as confidential because its disclosure would enable others to compete with it to lure away TVA's business. (*Id.*, Page ID ## 541–42.) Moreover, EPI's argument that dissimilar policies contain

44

similar terms is speculative and contradicted by Mr. Gaffney's sworn affidavit that the terms offered to TVA are specific to TVA. (*Id.*, Page ID # 542.)[10]

### 3. TVA satisfied the foreseeable harm requirement.

The district court correctly found that TVA had demonstrated that disclosure of the information redacted from the TVA-AEGIS Policy would harm AEGIS' competitive standing in the highly specialized field of insurance underwriting. (Mem. Op. RE 48, Page ID # 964.)

The competitive harm to AEGIS in the insurance context is parallel to the competitive harm to McGuireWoods in the legal context. *See supra* pages 37-39. If the terms and pricing offered by AEGIS to TVA were readily available to other insurers, competitors would be able to offer an insured the same coverage, at the same or a lower price, without having to incur the expense and burden of developing a competitive underwriting quote, thus harming AEGIS' commercial interests and its competitive position in the insurance marketplace. (Gaffney Decl., RE 36, Page ID ## 541–42; Eller Decl., RE 33, Page ID # 432.) *See, e.g.*, *McDonnell Douglas*, 180 F.3d at 306–07 (proposed prices for certain contract line items were commercial

---

[10]     EPI's assertion that a TVA-AEGIS policy was discussed at one of AEGIS' annual member conferences is simply incorrect (nor does the declaration in the record referenced for this proposition state this). (EPI Br. at Page 65 (referencing Supp. Tait Decl., RE 38-1, Page ID # 654).) The referenced presentation contains publicly available information about TVA. It does not contain the result of AEGIS' assessment of risk with regard to TVA, results which are confidential and contained within the Policy itself.

and disclosure enabled competitors to underbid the submitter of the information, thereby constituting competitive harm); *Webb*, 696 F.2d at 103 ("If a manufacturer's competitor could obtain all the data in the manufacturer's NDA, it could utilize them in its own NDA without incurring the time, labor, risk, and expense involved in developing them independently.").

And AEGIS' relationship with other insureds would also be harmed if the terms offered to TVA were disclosed. (Gaffney Decl., RE 36, Page ID ## 541–42.) These other insureds would be able to use the terms AEGIS offered to TVA which would put AEGIS at a competitive disadvantage. (*Id.*; Eller Decl., RE 33, Page ID # 432.) *See, e.g., McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182, 1190–91 (D.C. Cir. 2004) (in a reverse FOIA action, disclosure of submitter's option years prices would likely cause competitive harm by informing the bids of its rivals); *cf.*, *Water Transp. Ass'n v. I.C.C.,* 722 F.2d 1025, 1032 (2d Cir. 1983) ("Indeed, it has long been recognized under the antitrust laws that public disclosure of contract terms can undermine competition by stabilizing prices at an artificially high level.").

EPI's contention that there is no competitive harm here because dissimilar AEGIS policies or portions of policies *not* involving TVA are available online (EPI Br. at Pages 64–65) ignores Mr. Gaffney's testimony about the specific nature of the TVA-AEGIS Policy and how disclosure of the policy would reveal information

46

about AEGIS' assessment of risk with regard to TVA, and how that could competitively impact AEGIS' dealings with competitors as well as other insureds. (Gaffney Decl., RE 36, Page ID ## 541–42.)[11] Thus, the risk of harm to AEGIS lies in the disclosure of the particulars of the coverage offered to TVA because it would compromise AEGIS' relationship with other insureds who are offered, or who demand, different terms and prices than what AEGIS offers based on its assessment of that particular insured's risk. (Gaffney Decl., RE 36, Page ID ## 541–42; Eller Decl., RE 33, Page ID # 432.) This satisfies the foreseeable harm requirement. *See, e.g., S. Env't L. Ctr. v. TVA*, 659 F.Supp.3d 902, 918–19 (E.D. Tenn. 2023) (finding foreseeable harm based on submitters' declarations that information in withheld portions of contract could be used by competitors to gain an advantage in future negotiations).

Also without merit is EPI's argument that the age of the Policy negates the harm. (EPI Br. at Page 68.) It does not. AEGIS spent decades and millions of dollars developing its proprietary products and methodologies which are reflected in its insurance policies. (Gaffney Decl., RE 36, Page ID ## 541–42.) AEGIS' proprietary

---

[11] EPI's claim that AEGIS is not involved in a highly competitive insurance marketplace and therefore cannot claim to be competitively harmed by disclosure of its risk assessments for specific clients and premiums is speculation wholly without admissible factual support. It is directly contradicted by AEGIS' vice president of underwriting who has extensive experience and personal knowledge of the insurance industry, particularly in the energy sector. (Gaffney Decl., RE 36, Page ID ## 539–40.)

underwriting process would still be evident and valuable to competitors even in an out-of-date policy as would AEGIS' corporate business strategy with regard to risk. (*Id.*).

In sum, EPI has confused the general with the specific. The foreseeable harm identified by AEGIS is not related to disclosure of general information about AEGIS' business, but to disclosure of the specific pricing and terms and conditions of coverage as reflected in the AEGIS-TVA Policy. (Gaffney Decl., RE 36, Page ID ## 541–42.) Publicly available, high-level information about a submitter's business is not sufficient to raise a factual issue rebutting Mr. Gaffney's declaration that the specific terms of the TVA-AEGIS policy are confidential and competitively sensitive.

## II. Exemption 5 Provides an Independent Basis for Certain Withholdings.

### A. TVA's withholding of certain McGuireWoods information was proper under Exemption 5 and the attorney-client privilege.

The district court concluded that because the McGuireWoods information was properly withheld under Exemption 4, it did not need to consider whether it was also properly withheld under Exemption 5 and the attorney-client privilege. (Mem. Op., RE 48, Page ID # 957.) When information is protected under more than one FOIA exemption, a district court need not address the applicability of both exemptions. *See, e.g., Simon v. Dep't of Just.*, 980 F.2d 782, 784–85 (D.C. Cir. 1992) (when information is covered by Exemption 7(D), declining to address whether it was also

48

covered by Exemption 7(C)). This Court, however, may affirm on any ground supported by the record, *EEOC v. Ferrellgas, L.P.*, 97 F.4th 338, 350 n.7 (6th Cir. 2024), and Exemption 5 provides an alternative basis for withholding communications at issue.

### 1.   McGuireWoods' legal advice and guidance to clients is protected by the attorney-client privilege.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption protects records that ordinarily would be privileged in the civil discovery context, *see Sears Roebuck*, 421 U.S. at 148–49, such as information protected by the attorney-client privilege, *see id.* at 149. "The attorney-client privilege protects from disclosure 'confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client.'" *In re Grand Jury Subpoena* (*United States v. Doe*), 886 F.2d 135, 137 (6th Cir.1989); *In re Grand Jury Investigation*, 723 F.2d 447, 451 (6th Cir.1983)); *see also Upjohn v. United States*, 449 U.S. 383, 389 (1981) (the attorney-client privilege protects "communications between attorneys and clients" ).[12]

---

[12]   Communications must also be either inter-agency or intra-agency. *Lucaj v. FBI*, 852 F.3d 541, 547 (6th Cir. 2017). EPI has not disputed that these communications satisfy this requirement. (*See* EPI Br. at Pages 50–55.) Most courts of appeals to consider the scope of the term "intra-agency" have recognized that there are some situations in which people contracting with an agency to perform

McGuireWoods provided legal representation to TVA through TVA's membership in the CLG, PGen, and to TVA individually as to Clean Air Act issues. (Jaber Decl., RE 34, Page ID # 492; Gillen Decl., RE 35, Page ID # 528–29.) It is well-settled that the attorney-client privilege applies to communications between an attorney, corporations and government agencies, and their associated employees. *Upjohn*, 449 U.S. at 390; *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (in the governmental context, the "client" may be the agency). TVA personnel who seek legal advice and counsel from McGuireWoods attorneys, including those representing the CLG and PGen, are "clients" for purposes of the attorney-client privilege, and the McGuireWoods' attorneys provide these clients with legal counsel, guidance, and advice. (Jaber Decl., RE 34, Page ID ## 492–94; Gillen Decl.,

---

specific tasks "may be enough like the agency's own personnel to justify calling their communications 'intra-agency.'" *Rojas v. FAA*, 989 F.3d 666, 674 (9th Cir. 2021) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001)); *id.* at 674 n.2 (collecting cases). This Court took a narrow view of "inter-agency" in rejecting the argument that the deliberative process privilege—designed to protect internal government decision making—did not extend to communications with foreign governments. *Lucaj*, 852 F.3d at 681–82. But that case did not require this Court to consider whether communications with outside counsel hired by the agency could qualify as intra-agency. As the Ninth Circuit reasoned, "[i]t seems doubtful that Congress intended the term 'intra-agency' in Exemption 5 to exclude outside attorneys, because doing so would, for all practical purposes, preclude agencies from relying on the services of outside counsel in most instances." *Rojas*, 989 F.3d at 674. There is no need for this Court to reach this issue here, however, because EPI has not disputed that these communications are covered, and it is therefore not at issue in this case.

RE 35, Page ID ## 528–29.) The attorney-client privilege applies in a joint client context, such as when there are multiple clients within a client group (like the CLG and PGen) who share a common interest. (Jaber Decl., RE 34, Page ID # 492.).[13] *See, e.g.*, *Lionbridge Tech. v. Valley Forge Ins.*, 53 F.4th 711, 725 (1st Cir. 2022) (the common-interest doctrine "is typically understood to apply when two or more clients consult or retain an attorney on particular matters of common interest") (cleaned up).

EPI argues that the CLG Update emails are not protected by the attorney-client privilege because they were not for the purpose of rendering legal advice in confidence. (EPI Br. at Page 52.) EPI is wrong. The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients," and it "recognizes that sound legal advice . . . serves public ends and . . . depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. The withheld CLG documents contain communications from McGuireWoods as counsel to the group's members and relate to attorney analysis and advice on climate-related regulatory and litigation developments in which the CLG members share a common interest and which, if disclosed, would reveal confidences exchanged between the

---

[13]    EPI's "waiver" argument (EPI Br. at Page 53 n.13) has no basis in the record. The members of the CLG were represented by McGuireWoods as a joint client and the members of PGen were represented by McGuireWoods as a joint client. There are no facts to support a finding of waiver.

CLG members and their counsel as part of the joint representation. (Gillen Decl., RE 35, Page ID ## 530–31.) The CLG Update emails are, therefore, protected by the attorney-client privilege.

The documents related to PGen similarly contain legal advice and guidance from McGuireWoods attorneys who were retained to provide legal advice regarding the formation and incorporation of PGen as an entity, including draft and red-line incorporation documents and presentations, as well as confidential communications between PGen attorneys and PGen members concerning the group following its incorporation. (*Id.*, Page ID ## 532–33.)

The documents related to McGuireWoods' representation of TVA on Clean Air Act issues include information concerning TVA's motivations for retaining McGuireWoods as well as discussions between a TVA attorney and a McGuireWoods attorney about provisions of a legal services contract and red-line drafts of the contract. (*Id.*, Page ID ## 533–34.) The documents also contain legal advice and guidance McGuireWoods gave to TVA, including attorney commentary, analysis, advice, and guidance on Clean Air Act regulatory developments. (*Id.*, Page ID ## 534–35.) This advice was provided to TVA clients and attorneys on a variety of Clean Air Act regulatory topics, and the advice was informed by TVA's confidential communications to McGuireWoods regarding TVA's specific needs and requests for legal analysis. (*Id.*)

52

Yet EPI contends that these communications somehow are outside the scope of the attorney-client privilege. EPI initially argues that the attorney-client privilege in the context of FOIA is somehow narrower than in the normal civil discovery context. (EPI Br. at Page 51.) That is simply not the law. *See United States v. Weber Aircraft Corp.*, 465 U.S. 792 (1984) [hereinafter "*Weber Aircraft*"] (holding that the scopes of the various privileges are coextensive in the FOIA and civil discovery contexts); *FTC v. Grolier Inc.*, 462 U.S. 19 (1983) [hereinafter "*Grolier*"] (same). "[To allow a party to] obtain through the FOIA material that is normally privileged would create an anomaly in that the FOIA could be used to supplement civil discovery. We have consistently rejected such a construction of the FOIA." *Weber Aircraft,* 465 U.S. at 801; *see also Grolier*, 462 U.S. at 26–27 ("Exemption 5 incorporates the privileges which the Government enjoys under the relevant statutory and case law in the pretrial discovery context.") (emphasis omitted) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).

EPI next argues that the CLG Updates sent by McGuireWoods to CLG members are not privileged because the emails constitute "ordinary business development" (EPI Br. at Page 52) or are simply a recitation of publicly available information (*id.* at Page 58). Again, EPI is wrong. As explained in the Gillen Declaration, the CLG Updates contain communications from CLG's counsel to the

53

CLG members relating to attorney analysis and advice on climate-related regulatory and litigation developments in which the CLG members share a common interest and which, if disclosed, would reveal confidences exchanged between the CLG members and their counsel as part of the joint representation. (Gillen Decl., RE 35, Page ID ## 530–31.) EPI's assertion that these emails and others are akin to information McGuireWoods makes "public" on its website or are business development emails is speculative and contradicts the declarations of both Mr. Jaber and Ms. Gillen. TVA, the CLG, and PGen retained McGuireWoods for legal advice; it should not be a surprise to EPI that they do not pay McGuireWoods to provide them information that the firm otherwise makes public on its website.

Similarly, the founding members of PGen retained McGuireWoods to provide legal advice on the formation and incorporation of PGen. (*Id.*, Page ID ## 532–33.) Communications between McGuireWoods attorneys and these founding PGen members (and clients of McGuireWoods) contain confidential communications relating to legal advice and guidance regarding PGen formation and incorporation, including draft and red-line incorporation documents and presentations. (*Id.*) These communications were made in confidence and in the context of that attorney-client relationship. The communications are also clearly designated "**PRIVILEGED AND CONFIDENTIAL - ATTORNEY CLIENT COMMUNICATION - ATTORNEY WORK PRODUCT**" in a heading at the top of each and there is no

54

evidence they were distributed beyond the joint client. (*Id.*, Page ID ## 530–31; *see, also e.g.*, *Vaughn* Index, RE 45-1, Page ID ## 829–30 (*see, e.g.*, Nos. 001, 006, 011).)

EPI's critique of an entry in the *Vaughn* Index (EPI Br. at Page 54 (discussing No. 042)) also fails to create an issue of fact that the information is not privileged. As explained in Mr. Jaber's declaration and in the *Vaughn* Index, this document, which is titled "Power Generators Air Coalition, DRAFT – Topics for First Meeting," was an attachment to a McGuireWoods email communication (No. 040), discussing draft documents and forwarding them to the entities who retained McGuireWoods to assist them in forming PGen. (*Vaughn* Index, RE 45-1, Page ID # 833.) As Mr. Jaber explained, "[o]ne of these draft documents attached to those emails, No. 042, reflects confidential information from PGen members regarding the substantive subject matters within [Clean Air Act] regulatory law on which the members sought legal advice. Accordingly, No. 042 contains information subject to the attorney-client privilege." (Supp. Jaber Decl., RE 46, Page ID # 889.) EPI claims that the "title" of this document does not match its description and appears similar to another document where the privilege is not claimed. This does not mean that the document does not contain privileged information. It is unsurprising that a topic for discussion at a kickoff meeting of a group formed for the purpose of receiving legal advice on Clean Air Act rules and regulations would be legal advice on said rules

and regulations tailored to that client's confidential communications to its attorney. EPI's argument that this does not sustain TVA's burden of showing the privilege applies does not rebut Mr. Jaber's declaration and should be rejected.

Finally, EPI brings up three documents (EPI Br. at Page 26 n.2 (discussing Nos. 113, 115 & 116 as having redactions solely pursuant to Exemption 5)), which have nothing to do with the CLG or PGen and are irrelevant to any of EPI's other arguments. (*Vaughn* Index, RE 45-1, Page ID ## 843–44.) These documents consist of an email chain between a McGuireWoods attorney and TVA attorneys regarding a legal interpretation of a provision in the draft contract for legal services for the Clean Air Act matter. (Gillen Decl., RE 35, Page ID ## 533–37.) The withheld materials are communications between an attorney (McGuireWoods) and clients (attorneys in TVA's Office of General Counsel) and reflect TVA's motivation for obtaining legal counsel as well as attorney analysis of contract provisions. (*Vaughn* Index, RE 45-1, Page ID ## 843–44 (Nos. 113, 115 &116); Gillen Decl., RE 35, Page ID # 534.) There is no question that this information is privileged.

### 2.    TVA satisfied the foreseeable harm requirement.

TVA also satisfied the foreseeable harm requirement for information withheld due to the attorney-client privilege. Courts have consistently emphasized the sound public policy underlying Exemption 5 and the attorney-client privilege, namely, "that sound legal advice or advocacy serves public ends and that such advice or

advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389; *Rocky Mountain Wild*, 56 F.4th at 929 (discussing the importance of the attorney-client privilege protection in the FOIA context). A government agency, like a private party, "needs . . . assurance of confidentiality so it will not be deterred from full and frank communications with its counselors." *In re Lindsey*, 148 F.3d 1100, 1105 (D.C. Cir. 1998).

The Eller and Gillen declarations explain that if the information subject to the attorney-client privilege were released, the ability of TVA personnel to have frank and open communications with TVA's attorneys would be destroyed, seriously harming TVA's fully informed decision making. (Eller Decl., RE 33, Page ID # 422; Gillen Decl., RE 35, Page ID ## 535–37.) This, in turn, would chill TVA's access to obtaining legal advice and counsel in areas important to TVA's operations and mission. (*Id.*)

## III.    The District Court Correctly Sustained TVA's FOIA Exemption 6 Withholdings.

The district court correctly sustained TVA's withholding, under FOIA Exemption 6, of (1) the names and contact information of private individuals who work for CLG members; (2) the names and contact information of private

individuals who work for PGen members;[14] and (3) the names and contact information of private individuals who work for potential PGen members. (Mem. Op. RE 48, Page ID # 953; Eller Decl., RE 33, Page ID # 423.) TVA withheld the identity of the CLG members (who are companies or organizations, not individuals) as well as the identity of potential CLG or PGen members (also companies or organizations, not individuals) under Exemption 4, not Exemption 6. Those Exemption 4 withholdings are discussed *supra* at pages 27-28.

Exemption 6 protects from disclosure information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). Courts construe this as extending "to any government 'records on an individual which can be identified as applying to that individual.'" *Rugiero v. United States Dep't of Just.*, 257 F.3d 534, 550 (6th Cir. 2001) (quoting *United States Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 601–02 (1982)). EPI does not contest that the information

---

[14]   TVA is not withholding, under any exemption, the corporate or company members of PGen. To the extent EPI argues that TVA did not release portions of a withheld record where a PGen member may have been identified, that is a reasonable segregability argument; an agency need not disclose redacted versions of records where "the unredacted markings would 'have minimal or no information content.'" *Perioperative Servs. & Logistics, LLC v. VA*, 57 F.4th 1061, 1069 (D.C. Cir. 2023) (quoting *Mead Data Center, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977)).

in question is personnel, medical, or "similar files" as courts construe those terms for purposes of Exemption 6.

There are, therefore, only two questions. First, whether the record demonstrates that disclosure of the withheld names would "compromise a substantial, as opposed to a de minimis, privacy interest." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002) (internal quotation marks and citation omitted). Second, whether the record demonstrates that this privacy interest outweighs "the public interest in the release of the records" such that "disclosure would [cause] a clearly unwarranted invasion of personal privacy." *Id.* at 33. (internal quotation marks and citation omitted). Because the answer to both questions in this case is "yes," the Court should affirm the district court.

### A.     The non-agency individuals' substantial privacy interests are served by withholding their identity and contact information.

The district court found that withholding the identity and contact information of the non-agency individuals, neither employees of TVA nor McGuireWoods, was appropriate because these individuals are entitled to their privacy. (Mem. Op., RE 48, Page ID # 956.) As this Court has explained, "[a] clear privacy interest exists with respect to such information as names, addresses, and other identifying information even where such information is already publicly available." *Rugiero*, 257 F.3d at 550. Indeed, "[c]ourts have recognized a substantial privacy interest in avoiding 'unwanted contact following a FOIA disclosure.'" *Perioperative Servs. &*

*Logistics,* 57 F.4th at 1068 (quoting *ACLU v. United States Dep't of Just.*, 655 F.3d 1, 11 (D.C. Cir. 2011).). This is particularly true with private individuals whose identities are not closely connected to government functioning. *See Pomares*, 113 F.4th at 884. And "use of the word substantial in this context means less than it might seem," as "[a] substantial privacy interest is anything greater than a *de minimis* privacy interest." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Ret. Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). Thus, there is no question that the privacy interest at issue here is "the unwarranted and involuntary disclosure of these individuals' non-public information." (Eller Decl., RE 33, Page ID ## 423–24.)

And the district court correctly concluded that it is reasonably foreseeable that involuntary disclosure of these individuals' identity and contact information would open them up to unsolicited and potentially harassing contact because there is a likelihood that this information would be posted on EPI's public website. (Mem. Op., RE 48, Page ID # 956.) It is reasonably foreseeable that this may occur because that is exactly what EPI did with other documents it received from TVA through FOIA. (Eller Decl., RE 33, Page ID ## 423–24.)

**B.      There is no cognizable public interest in disclosure of non-agency individuals' names and contact information.**

Because there are substantial privacy interests at stake, the Court must assess the public interest at issue and then "weigh [the privacy] interest 'against the public

60

interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy.'" *Norton*, 309 F.3d at 34 (quoting *Horner*, 879 F.2d at 878). It is EPI's "burden to 'show the information [he seeks] is likely to advance' the public interest." *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 854 F.3d 675, 683 (D.C. Cir. 2017) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). The only public interest cognizable under FOIA is the public "understanding of the operations or activities of the government." *United States Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 775 (1989); *Bibles v. Or. Nat. Desert Ass'n*, 519 U.S. 355, 355–56 (1997) (identifying relevant public interest as "extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to" (internal quotation marks and alterations omitted)).

EPI does not attempt to assert a public interest in the contact information that TVA withheld. Rather, it claims a "public interest in the *identities* of individuals joining with the government to influence policy." (EPI Br. at Page 61.) This confirms there is no public interest in the *contact information* for these non-agency individuals. "[T]o be cognizable under the FOIA, a public interest must sound in activities that reveal information about the government itself; it cannot sound in

61

activities exclusively concerning non-government actors." *Insider Inc. v. Gen. Servs. Admin.,* 92 F.4th 1131, 1136 (D.C. Cir. 2024).

Thus, the district court correctly concluded that this information was properly withheld. (Mem. Op., RE 48, Page ID # 955.)

As to the private individuals' names, EPI again claims a public interest in the identities "of individuals joining with the government to influence policy." (EPI Br. at Page 61.) But *individuals* that are employees of third parties—in their own capacities—are not "joining with" TVA to do anything. Moreover, the identity of individual employees "tells nothing about what the government is up to." *Long v. Off. of Personnel Mgmt.*, 692 F.3d 185, 193 (2nd Cir. 2012) (collecting cases and stating that "[i]n many contexts, federal courts have observed that disclosure of individual employee names tells nothing about what the government is up to"); *see also Abraham & Rose, P.L.C. v. United States*, 138 F.3d 1075, 1083 (6th Cir. 1998) ("[E]ven if the public may have an interest in how the IRS exercises its power over the collection of taxes, this does not necessarily mean that the identity or other personal information of individual taxpayers is relevant to shedding light on an agency's performance of its statutory duties."). Rather, it is their employers who are "joining" with TVA as members of the CLG and PGen. TVA is not withholding the identity of CLG members under Exemption 6; it is doing so under Exemption 4 as clients of McGuireWoods. TVA is also not withholding the identity of PGen

members at all; TVA advised EPI that those entities are publicly available online. (Eller Decl., RE 33, Page ID # 423; Apr. 4, 2023 Ltr., RE 33-2. Page ID # 440.)

In sum, EPI has not shown that the identity and contact information for these private, non-agency individuals would reveal anything about the government itself. Therefore, the district court's ruling should be affirmed.

## IV. TVA Satisfied Its Segregability Obligations.

An agency can carry "its burden in demonstrating that it released all segregable portions of . . . responsive documents" with a declaration stating that the agency "conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information." *Porup v. Cent. Intel. Agency*, 997 F.3d 1224, 1239 (D.C. Cir. 2021). That is exactly what happened here.

As to the McGuireWoods information, the district court found that TVA met its burden based on the Eller Declaration which attests that TVA conducted a line-by-line review of each withheld record and released all reasonably segregable or non-privileged material, as well as the specific justifications for segregability in the *Vaughn* Index. (Mem. Op., RE 48, Page ID ## 958-60; Eller Decl., RE 33, Page ID # 427.) The district court also found that TVA met its burden with regard to the TVA-AEGIS Policy, noting that Mr. Gaffney testified that all segregable portions were disclosed. (Mem. Op. RE 48, Page ID # 965.) Further, Mr. Eller testified that TVA carefully conducted a line-by-line review of the Policy to determine whether

any portion of the Policy was reasonably segregable and would result in meaningful disclosure without compromising the integrity of the applicable FOIA exemptions and privileges. (Eller Decl., RE 33 at Page ID # 434.) Based on Mr. Eller's line-by-line examination, he concluded that no additional reasonable segregable non-exempt information could be provided. (*Id.*) Nothing more was required.

EPI's segregability challenge is conclusory, circular, and frankly contradictory. As a starting point, EPI has failed to rebut the "presumption" that TVA "complied with the obligation to disclose reasonably segregable material," *Sussman v. United States Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (agency entitled to presumption regarding reasonably segregable material), in light of Mr. Eller's sworn statements that line-by-line reviews of the documents were conducted and that any reasonably segregable non-exempt material was released. Indeed, TVA produced almost 200 documents, either in whole or in part, as part of TVA's line-by-line reviews.

EPI's argument that TVA's good faith re-review of documents shows a lack of credibility should also be rejected. Courts repeatedly decline to infer bad faith from an agency's decision to "voluntarily reevaluat[e] and revis[e] its FOIA withholdings." *ACLU v. Dep't of Def.*, 628 F.3d 612, 627 (D.C. Cir. 2011). For example, the court in *Military Audit Project v. Casey* "emphatically reject[ed] [a] line of argument" akin to EPI's here, 656 F.2d 724, 754 (D.C. Cir. 1981), concluding

64

that to fault an agency for such revisions "would work mischief in the future by creating a disincentive for an agency to reappraise its position, and when appropriate, release documents previously withheld." *Id.*

Further, an agency need not disclose redacted versions of records where "the unredacted markings would 'have minimal or no information content.'" *Perioperative Servs.*, 57 F.4th at 1069 (quoting *Mead Data Ctr.,* 566 F.2d, 261 n.55). Nor does an agency need to disclose material that is inextricably intertwined with exempt material. *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). No. 028 on the *Vaughn* Index, coupled with Mr. Jaber's description of this document in his declaration, illustrates the extent to which, when a document was withheld in full and nonexempt information was not reasonably segregable, a description of the non-exempt information was nevertheless provided in the declaration. (Supp. *Vaughn* Index, RE 45-1, at Page ID # 843; Supp. Jaber Decl., RE 46, at Page ID # 882 at ¶ 21(a) (describing non-exempt information as scheduling a meeting with the new member as well as pleasantries).)

Considering the testimony, along with the entries in the *Vaughn* Index and the redacted TVA-AEGIS Policy, the district court correctly determined that TVA was entitled to a presumption that it complied with its segregability obligations, which has not been rebutted by EPI. (Mem. Op., RE 48, Page ID ## 957-60, 965.) *See, e.g., Sussman*, 494 F.3d at 1117 (affirming the district court's findings regarding

65

segregability and holding that the plaintiff had not presented evidence to overcome the presumption).

## V.  The District Court Correctly Concluded that EPI is Not Eligible to Recover an Award of Attorney's Fees Under FOIA.

The district court entered judgment in favor of TVA as to both FOIA requests. (Mem. Op., RE 48.) TVA is therefore the prevailing party on all claims—not EPI. Despite that reality, EPI argues that the district court erred and should have found that EPI "substantially prevailed" and awarded attorney fees and costs. (Mot. for Attorney's Fees, RE 52.) EPI's argument should be rejected.

Under FOIA, a plaintiff is eligible for attorney's fees only when the plaintiff "substantially prevailed" by obtaining the relief sought in the complaint through either (1) a judicial order or enforceable written consent decree; or (2) if the agency voluntarily or unilaterally changed its position and the plaintiff's claim was not insubstantial. *See Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 370 (D.C. Cir. 2008). This Court has not considered the precise contours of this requirement, but seven other circuits have held "there still must be a causal nexus between the litigation and the voluntary disclosure or change in position by the Government" for a plaintiff to be entitled to fees under this provision. *First Amend. Coal. v. United States Dep't of Just.*, 878 F.3d 1119, 1128 (9th Cir. 2017) (collecting cases).

**A.      The catalyst theory does not apply to documents released due to McGuireWoods' withdrawal of its Exemption 4 objections to certain material.**

A FOIA requestor who does not prevail in the district court can obtain attorney's fees only where there is "a voluntary or unilateral change in position by the agency." 5 U.S.C. § 552(a)(4)(E). Not every disclosure of documents in FOIA litigation qualifies as a catalyst for purposes of attorney's fees. *See Weisberg v. United States Dep't of Just.*, 848 F.2d 1265, 1273 (D.C. Cir. 1988) (just because a FOIA plaintiff may have won a battle or two in the litigation below does not mean that it substantially prevailed). "[T]he plaintiff has the burden of showing that it is more probable than not that the government would not have performed the desired act absent the lawsuit." *Bernhardt*, 947 F.3d at 97 (internal quotations marks omitted). EPI did not meet its burden of showing that it substantially prevailed.

FOIA does not define "voluntary or unilateral change in position by the agency" with respect to "substantially prevailed." 5 U.S.C. § 552(a)(4)(E). "So, as usual," the Court must ask what the "ordinary, contemporary, common meaning [of those terms] was when Congress enacted" the FOIA amendments in 2007. *See Argus Leader*, 588 U.S. at 433–34 (internal quotation marks and citation omitted). Just like they did in 2007, the term "voluntary" means "not impelled by outside influence" (i.e., a voluntary statement), and the term "unilateral" means "[o]ne-sided; relating to only one of two or more persons or things" (i.e., unilateral mistake). Black's Law

67

Dictionary (8th ed. 2004); *see also Argus Leader*, 588 U.S. at 434 (looking to dictionary definitions of FOIA terms). Thus, a third party's change of position in no way qualifies as a "voluntary or unilateral change in position" by the agency. EPI has cited no case stating otherwise.

Exemption 4, "by its nature, requires agencies to rely on assertions by the third parties that provided the information sought in a FOIA request." *Pomares*, 113 F.4th at 882–83. When the submitter decides that information it originally requested be withheld can be released, it is appropriate for an agency to consider releasing the material based on this new information. 5 U.S.C. § 552(a)(4); 18 C.F.R. 1301.8; *Herrick v. Garvey*, 298 F.3d 1184, 1194 n.9 (10th Cir. 2002) (It would be a "curious outcome" under FOIA if "the government could then continue to refuse to disclose the information under FOIA indefinitely—using Exemption 4 and the fact that the information had never been released to the public as its rationale—even though the submitter of the information no longer wished the information to remain secret.").

TVA's regulations incorporate this principle. Pursuant to these regulations, TVA notifies submitters of FOIA requests and, "[i]f a submitter has any objections to disclosure," it provides TVA "a detailed written statement" that "must show why the information constitutes a trade secret or commercial or financial information that is confidential." 18 C.F.R. § 1301.8(f). In determining whether to release the information, "TVA will consider a submitter's objections and specific grounds for

68

nondisclosure in deciding whether to disclose the requested information." *Id.* § 1301.8(g).

TVA followed its regulations here. TVA reviewed the responsive records to determine whether documents may contain information within the scope of Exemption 4 and, finding that the documents could contain such information, TVA provided McGuireWoods with notice and copies of those records. (Eller Decl., RE 33, Page ID # 417.) McGuireWoods initially provided TVA with a basis for withholding all of the Exemption 4 material that TVA withheld. (*Id.*, Page ID ## 417–18; Jaber Decl., RE 34, Page ID ## 495–96; McGuireWoods Obj., RE 34-2, Page ID ## 517–18.) On the basis of this information, TVA determined that withholding was appropriate. (Eller Decl. RE 33, Page ID ## 417–18.) However, early in the litigation, and prior to any motions practice in this case, McGuireWoods advised TVA that it was withdrawing its Exemption 4 objections to certain information, thus allowing TVA to disclose 166 documents. (Eller Decl., RE 33, Page ID # 424.) At EPI's request, TVA asked that McGuireWoods review six additional documents, and McGuireWoods withdrew its objections to those documents. (*Id.*, Page ID # 425; Apr. 4, 2023 Ltr., RE 33-2, Page ID # 438.) Shortly thereafter, McGuireWoods advised TVA it had withdrawn additional Exemption 4 objections, thus allowing TVA to disclose four additional documents. (Eller Decl., RE 33, Page ID # 426; Jun. 9, 2023 Ltr., RE 59-3, Page ID # 1087.) On the basis of

69

this new information, TVA determined that the material should no longer be withheld. It therefore promptly produced the documents and information and revised its *Vaughn* index accordingly. (Eller Decl., RE 33, Page ID ## 424–26; Jaber Decl., RE 34, Page ID # 496.)

When McGuireWoods withdrew its objections, TVA simply made a decision based on the new information it received from McGuireWoods consistent with its own normal regulatory procedures. *See* 18 C.F.R. 1301.8. But TVA did not change *its* position. This decision "was part of the back-and-forth process of an agency handling a FOIA request." *Vidal-Martinez v. United States Dep't of Homeland Sec.*, 84 F.4th 743, 750 (7th Cir. 2023). And, because the district court's determination of whether TVA changed its position due to the lawsuit or was simply working through its normal FOIA process is a question of fact, it is reviewed for clear error. *Bernhardt*, 947 F.3d at 95–97 ("Appellate courts review findings of fact only for clear error . . . and actual causation is as much a question of fact in the FOIA context as it is in any other."). In this case, the district court correctly concluded based on the fact that TVA did not change its position, but rather responded appropriately to new information from McGuireWoods, that EPI was not eligible for fees.

This result makes sense since requiring TVA to pay fees because McGuireWoods changed its position would not advance the purpose of the FOIA fees statute. FOIA's attorney's fee provision "was not enacted to provide a reward

70

for any litigant who successfully forces the government to disclose information it wished to withhold[,]" rather, its "more limited purpose . . . [is] to remove the incentive for administrative resistance to disclosure requests" when such resistance is based solely on the knowledge "that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation." *Davy v. Cent. Intel. Agency*, 550 F.3d 1155, 1158 (D.C. Cir. 2008). That reason simply does not apply where the agency appropriately relies on a third party who has articulated reasonable grounds for withholding information based on Exemption 4. TVA's disclosure of the McGuireWoods information, previously withheld under Exemption 4, was not due to any administrative resistance on the part of TVA but to McGuireWoods' objection.

To the extent EPI argues that the district court's order directing TVA to file a supplemental *Vaughn* index and/or declarations makes EPI eligible for fees, that argument is without merit. A court order to aid a determination of whether FOIA exemptions are properly asserted does not give rise to a finding of eligibility for attorney's fees. *See, e.g., Campaign for Responsible Transplantation v. FDA*, 511 F.3d 187, 196 (D.C. Cir. 2007) (holding that "[a] Vaughn index, without more, does not constitute court-ordered relief for a plaintiff on the merits of its FOIA claim, so it does not change the legal relationship between the plaintiff and the defendant").

EPI's argument that TVA's good faith re-review of documents and revisions to TVA's *draft Vaughn* index is indicative of "unreasonable obduracy" and somehow justifies an award of fees should also be rejected. Courts repeatedly decline to infer bad faith from an agency's decision to "voluntarily reevaluat[e] and revis[e] its FOIA withholdings." *ACLU v. Dep't of Def.*, 628 F.3d 612, 627 (D.C. Cir. 2011). And the district court here made no finding of bad faith on the part of TVA.

### B.     EPI is not entitled to fees for the nine documents for which TVA determined that Exemption 5 did not apply.

Nor are attorney's fees warranted with regard to the remaining nine documents—2.5% of the documents responsive to FOIA Request 109—that TVA released after initially withholding them under Exemption 5. These documents relate to TVA and McGuireWoods' discussions and edits to the legal services contract for Clean Air Act issues. (Apr. 4, 2023 Ltr., RE 59-2, Page ID ## 1080, 1083–86; Nov. 28, 2023 Ltr., RE 59-4, Page ID # 1088.) This disclosure was also not caused by the litigation, but by TVA's discovery that EPI already had a copy of the final contract. And these documents represent such a small percentage of the total sought that their disclosure is insufficient to demonstrate that EPI substantially prevailed. *See Weisberg*, 848 F.2d at 1273 (affirming district court's denial of fees where district court observed that the plaintiff "may have won a battle or two but he lost the war").

72

Even if the Court were to find that EPI's lawsuit prompted TVA to release these nine documents, EPI still would not be entitled to attorney's fees. If a plaintiff is found to be eligible for fees, the court proceeds to the entitlement prong, which includes consideration of four non-exclusive factors, (1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents. *See McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 711 (D.C. Cir. 2014).

EPI would not be entitled to fees because it cannot show that the disclosure of these nine documents had any public benefit or that TVA's position was not substantially justified. *See McKinley*, 739 F.3d at 711 (discussing entitlement criteria).[15]

"[T]he public benefit criterion speaks for an award (of attorneys' fees) where the complainant's victory is likely to add to the fund of information that citizens may use in making vital political choices." *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979) (internal quotation marks and citation omitted). In this case, EPI had

---

[15]    The second and third entitlement factors do not weigh strongly in favor of fees or are neutral. These factors are "often combined . . . into a single factor assessing whether a plaintiff 'ha[d] sufficient private incentive to seek disclosure' of the documents without expecting to be compensated." *Edelman v. SEC*, 356 F. Supp. 3d 97, 106 (D.D.C. 2019) (citation omitted). These factors do not weigh strongly in favor of fees here or are neutral.

already been provided the final contract between McGuire Woods and TVA through a previous FOIA request (Apr. 4, 2023 Ltr., RE 33-2, Page ID ## 439–40), and the public benefit of internal discussions about language in this draft contract is minimal to none. EPI does not even attempt to explain what public benefit would result from their disclosure.

Nor can EPI show that TVA's position as to these documents was unreasonable. *Morley*, 894 F.3d at 393 ("[T]he question for a district court is not whether the agency's legal and factual positions were correct. The question is whether the agency's positions were reasonable."). The documents could have been withheld under the attorney-client privilege because they were confidential communications between McGuireWoods and TVA attorneys that reveal the nature of legal services provided and reveal work and research into a particular area. (Gillen Decl., RE 35, Page ID # 531.) The majority of the circuit courts have concluded that this type of communication may be withheld under FOIA because it qualifies as intra-agency. *See supra* note 12.

A court retains discretion to deny fees so long as any of the four criteria favor a defendant. *See Morley*, 894 F.3d at 396. That is certainly true here. EPI has not shown the kind of outcome that courts have deemed sufficient to entitle a FOIA plaintiff to fees.

74

## CONCLUSION

For the reasons stated and based upon the authorities cited, the judgment of the district court for TVA on EPI's FOIA claims and the district court's denial of EPI's motion for attorney's fees and costs should both be affirmed.

Respectfully submitted,

*s/Lane E. McCarty*
David D. Ayliffe
Associate General Counsel
F. Regina Koho
Lane E. McCarty
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.2396
lemccarty@tva.gov

Attorneys for Tennessee Valley Authority

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 17,941 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Word 2016 in Times New Roman (14 point) proportional type.

*s/Lane E. McCarty*
Attorney for Tennessee Valley Authority

76

# CERTIFICATE OF SERVICE

I certify that on May 16, 2025, the foregoing document was electronically filed and served by operation of the Court's CM/ECF system on the following attorney of record for Plaintiff-Appellant EPI in this matter:

Allison Kole, Esq.
Zehava Robbins, Esq.
Energy and Policy Institute
PO Box 337
El Verano, CA 95433
(202) 596-7540
allison@energyandpolicy.org
zehava.robbins@gmail.com

Chris Irwin, Esq.
2131 Riverside Drive
Knoxville, TN 37915
(865) 257-4029
christopherscottirwin@yahoo.com

*s/Lane E. McCarty*
Attorney for Tennessee Valley Authority

77

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record Entry No. | Document Description | Page ID Range |
|---|---|---|
| RE 21-1 | McGuireWoods Request (FOIA Request 21-FOI-00109) | 147–148 |
| RE 21-6 | AEGIS Request (FOIA Request 21-FOI-00208) | 159–163 |
| RE 33 | Declaration of Buddy Eller | 413–434 |
| RE 33-2 | April 4, 2023 Letter | 438–441 |
| RE 34 | Declaration of Makram B. Jaber, Esq. | 491–513 |
| RE 34-2 | McGuireWoods Objection | 517–518 |
| RE 35 | Declaration of Maria Gillen | 528–537 |
| RE 36 | Declaration of Martin Gaffney | 539–546 |
| RE 36-1 | TVA-AEGIS Policy (redacted) | 549–597 |
| RE 36-2 | AEGIS Objection | 598–599 |
| RE 37 | Declaration of Kirk Kelley | 604 |
| RE 38-1 | Supplemental Declaration of Daniel Tait | 654 |
| RE 45-1 | Supplemental *Vaughn* Index | 829–833, 843–44, 871 |
| RE 46 | Supplemental Declaration of Makram B. Jaber, Esq. | 872–913 |
| RE 46-1 | Supplemental Chart | 916–920 |
| RE 48 | Memorandum Opinion Granting TVA's Motion for Summary Judgment | 932–965 |
| RE 49 | Judgment Order | 966 |
| RE 52 | EPI's Motion for Attorney's Fees and Costs | 970 |
| RE 59-3 | June 9, 2023 Letter | 1087 |
| RE 59-4 | November 24, 2023 Letter | 1088 |
| RE 60 | Notice of Appeal (RE 48) | 1090 |
| RE 66 | Memorandum Opinion and Order Denying EPI's Motion for Attorney's Fees and Costs | 1131–1136 |
| RE 67 | Notice of Appeal (RE 66) | 1137 |